No. 22-16751

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

EARTH ISLAND INSTITUTE and CENTER FOR BIOLOGICAL
DIVERSITY,
*Plaintiffs – Appellants*,

v.

UNITED STATES FOREST SERVICE and MARGIE B. DEROSE,
*Defendants – Appellees.*

## APPELLANTS EARTH ISLAND INSTITUTE and CENTER FOR
## BIOLOGIAL DIVERSITY'S OPENING BRIEF

On Appeal from the United States
District Court for the Eastern District of California,
Honorable Morrison C. England, Jr.
Case No: 2:19-cv-01271-MCE-DB

_____

Thomas C. Buchele
OR Bar No. 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
tbuchele@lclark.edu

*Attorney for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Earth Island Institute and the Center for Biological Diversity state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States and that no publicly held corporation owns 10% or more of their stocks because they have never issued any stock or other security.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES ................................................................. 1

INTRODUCTION ............................................................................ 2

STATEMENT OF CASE ................................................................... 5

　Statement of Facts ..................................................................... 5

　Procedural History .................................................................... 10

SUMMARY OF THE ARGUMENT ................................................... 11

ARGUMENT.................................................................................. 13

　I.　The Forest Service failed to consider a reasonable range of alternatives and explain why it excluded viable alternatives from consideration. ........................ 15

　　A.　Standard of Review & Preservation of Issues for Appeal ........................ 16

　　B.　Earth Island exhausted this issue before the Forest Service. .................... 16

　　C.　The Forest Service's consideration of alternatives in the 2018 EA was arbitrary and capricious because it did not analyze an adequate range of alternatives and failed to explain why it did not consider viable alternatives offered by Earth Island. ................................................................. 22

　　　1.　NEPA's Basic Requirements for Considering Reasonable Alternatives23

　　　2.　Earth Island's proposed alternatives are viable because they meet the Project's purpose and need, they are distinguishable from the alternatives considered by the Service, and they would achieve different results........... 23

3. The Forest Service violated NEPA by failing to give an adequate explanation for excluding the viable alternatives proposed by Earth Island from meaningful consideration. ................................................... 28

II. The Forest Service's failure to offer an opportunity to comment on the 2018 EA violated both NEPA and the Service's objection process regulations. .......... 30

A. Standard of Review & Preservation of Issues for Appeal ........................ 30

B. NEPA's regulations require public scrutiny. ........................................... 30

C. The Forest Service's objection process requires that it offer an opportunity for public comment on EAs revised in light of new information or changed circumstances. ................................................................................................ 32

III. The Forest Service violated its ongoing NEPA obligations by failing to supplement its NEPA analysis for the Three Creeks Project in response to the bark beetle outbreak and its subsequent announcement of the Inyo Craters Project. ............................................................................................................ 37

A. Standard of Review & Preservation of Issues for Appeal ........................ 39

B. The Forest Service Failed to Satisfy Its Ongoing Obligation to Supplement Its NEPA Analysis. ......................................................................................... 40

1. The Forest Service failed to supplement its NEPA analysis to address significant new circumstances and information resulting from the bark beetle outbreak. ................................................................................................ 41

i. The removal of the marten units from the Three Creeks Project area required supplemental NEPA analysis. .................................................... 42

ii. The Project's effects are no longer within the range of alternatives considered in the 2018 EA after being revised in response to the bark beetle outbreak. ......................................................................................... 45

2. Beyond failing to supplement its NEPA analysis, the Forest Service has failed to even consider whether the Inyo Craters Project—specifically its cumulative impacts—warranted such supplemental analysis. .................... 46

i.   Earth Island's amended complaint filed with the district court was pleaded sufficiently broadly to encompass the Service's failure to consider the Inyo Craters Project because the Service generated the claim's underlying facts..........................................................................46

ii.  The Forest Service violated its NEPA obligations by failing to consider whether the Inyo Craters Project warranted supplemental NEPA analysis...............................................................................................49

iii. Specifically, the cumulative impacts of the Three Creeks Project and the Inyo Craters Project require supplemental NEPA analysis..........53

CONCLUSION ...............................................................................................57

CERTIFICATE OF COMPLIANCE....................................................................58

REGULATORY ADDENDUM ........................................................................A-1

CASES

*'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006) .................. 18

*Bair v. Cal. Dep't of Transp.*, 982 F.3d 569 (9th Cir. 2020) .................................. 13

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) ........................................ 27

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008) .................................................................................... 32

*California v. Block*, 690 F.2d 753 (9th Cir. 1982) ................................ 14, 31, 33, 34

*Camp v. Pitts*, 411 U.S. 138 (1973) ...................................................................... 15

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) .................................. 18

*Ctr. for Biological Diversity v. Gould*, 150 F. Supp. 3d 1170 (E.D. Cal. 2015) ... 31, 32

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ...................................................................................... 15, 29

*Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975) ................................................... 47

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004) ................................. 17, 21

*Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010 (9th Cir. 2012) ...... 22, 28, 29

*Env't Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ............................................................................................................. passim

*Environmental Protection and Information Center v. U.S. Forest Service*, 234 Fed. Appx. 440 (9th Cir. 2007) ........................................................................ 25, 26, 27

*ForestKeeper v. Elliot*, 50 F. Supp. 3d 1371 (E.D. Cal. 2014) .............................. 31

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ........... passim

*Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836 (9th Cir. 2013) ... 17, 18

*Habitat Educ. Ctr. v. U.S. Forest Serv.*, 673 F.3d 518 (7th Cir. 2012) ................. 55

*Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174 (9th Cir. 1990) ......... 24

*Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) .... 38, 39, 55

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006) ...... 39, 42

*Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645 (9th Cir. 2015).. 47

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) .................................... 18

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ................................................. 42, 44

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ................................................................................................. 14, 38, 53

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010) .................................................................................................... 18

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002) ................. 19

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) .. 26

*NRDC v. U.S. Forest Serv.*, 634 F. Supp. 2d 1045 (E.D. Cal. 2007) .................... 31

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783

    (S.D.W. Va. 2009) ................................................................... 31

*Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151 (D. Or. 2011) ............. 18

*Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037 (9th Cir. 2011) .. 45

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) .......................................................... 46

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592 (9th

    Cir. 2010) ................................................................... 24

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ................... passim

*Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir.1980) 49, 51, 52

STATUTES

28 U.S.C. § 1292(a)(1) ...................................................................... 1

28 U.S.C. § 1331 ................................................................................ 1

42 U.S.C. § 4332(2)(E) ...................................................................... 15

42 U.S.C. § 4332(C) .......................................................................... 14

5 U.S.C. § 706 ................................................................................... 17

5 U.S.C. § 706(1) ......................................................................... 39, 47

5 U.S.C. § 706(2)(A) ......................................................................... 16

5 U.S.C. §§ 701–706 ........................................................................... 1

5 U.S.C. §§ 706(1)–(2) ...................................................................... 14

## FEDERAL RULES

Federal Rule of Appellate Procedure 4(a)(1)(B) ...................... 1

Federal Rule of Civil Procedure 8 ........................................ 46

## REGULATIONS

36 C.F.R. § 218.2 (2018) ................................................. 20

36 C.F.R. § 218.22(a) (2018) ............................................ 32

36 C.F.R. § 218.22(d) (2018) ...................................... 1, 33, 37

36 C.F.R. § 219.9(b)(1) (2023) ........................................... 8

36 C.F.R. § 219.9(c) (2023) .............................................. 8

36 C.F.R. § 220.6 (2023) ................................................ 56

36 C.F.R. § 220.6(b) (2023) ..................................... 10, 41, 56

36 C.F.R. § 220.6(d)(3)–(4) (2023) ..................................... 10

40 C.F.R. § 1500.1(b) (2018) ....................................... 13, 30

40 C.F.R. § 1500.2(d) (2018) ........................................... 30

40 C.F.R. § 1500.2(e) (2018) ....................................... 15, 23

40 C.F.R. § 1501.4(b) (2018) ....................................... 14, 31

40 C.F.R. § 1502.9(c) (2018) ....................................... 38, 45

40 C.F.R. § 1502.9(c)(1) (2018) ................................. 38, 47, 55

40 C.F.R. § 1502.9(d) (2020) ........................................... 38

40 C.F.R. § 1506.13 (2020) ............................................................ 13, 53

40 C.F.R. § 1506.6(a) (2018) .......................................................... 13, 31

40 C.F.R. § 1506.6(b) (2018) ................................................................ 31

40 C.F.R. § 1506.6(d) (2018) ............................................................... 31

40 C.F.R. § 1507.2(d) (2018) ............................................................... 15

40 C.F.R. § 1508.1(g) (2022) ............................................................... 53

40 C.F.R. § 1508.25(a)(2) (2018) ......................................................... 53

40 C.F.R. § 1508.7 (2018) .................................................................... 53

40 C.F.R. § 1508.9(a)(1) (2018) ........................................................... 14

40 C.F.R. § 218.12(a)–(b) (2018) ......................................................... 33

40 C.F.R. § 218.8(d)(5) (2018) ............................................................. 20

40 C.F.R. §§ 1500–1508 (2018) ........................................................... 13

FEDERAL REGISTER

CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental

    Policy Act Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981) ............................ 23

National Environmental Policy Act Implementing Regulations Revisions, 87 Fed.

    Reg. 23453 (Apr. 20, 2022) ................................................................ 53

Predecisional Administrative Review Process, 78 Fed. Reg. 18481 (Mar. 27, 2013)

    (codified at 36 C.F.R. pt. 218) ............................................................ 33

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701–706. The district court granted Defendant-Appellee's motions for summary judgment and denied Plaintiff-Appellants' cross-motions on September 9, 2022, and entered judgment for Defendant-Appellee. 1-ER-32. Plaintiff-Appellants filed their Notice of Appeal on November 7, 2022, within the time limit allowed by Federal Rule of Appellate Procedure 4(a)(1)(B). 3-ER-547–48. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

# STATEMENT OF ISSUES

1. Under the National Environmental Policy Act, did the Forest Service consider an inadequate range of alternatives in its 2018 environmental assessment, given that Earth Island notified the Forest Service of viable alternatives in both its comments on the 2016 environmental assessment and its objections to the 2017 environmental assessment?

2. Under the Forest Service's regulations at 36 C.F.R. § 218.22(d) and the National Environmental Policy Act, was the Forest Service required to offer an opportunity for public comment on the revised 2018 environmental assessment, given that the Forest Service prepared the 2018 assessment based on new information and changed circumstances?

3. Under the National Environmental Policy Act, did the Forest Service arbitrarily and capriciously conclude in its 2020 supplemental information report that significant new circumstances or information resulting from the 2020 bark beetle kill did not warrant supplemental analysis and unlawfully withhold agency action by failing to consider whether the cumulative impacts of the Inyo Craters Area Bark Beetle Mortality Hazard Abatement Project also warranted such supplemental analysis?

## INTRODUCTION

The Inyo National Forest was once dominated by large, majestic trees that regulated wildfire in the region and served as crucial habitat for species like the black-backed woodpecker and Pacific marten. However, after decades of fire suppression and "fuel reduction" logging projects, there is now a deficit of larger, fire-resistant trees. In 2012, the U.S. Forest Service ("Forest Service" or "Service") announced the Three Creeks Forest Health and Restoration Project ("Three Creeks Project" or "Project") to increase the forest's fire and disease resiliency by returning it to historic conditions. The Project is currently being implemented on 9,031 acres of the Inyo National Forest in an area encompassing Mammoth Lake, west of the California-Nevada border.

Although the environmental assessment ("EA") published by the Service in 2018 describes desired conditions for the Project area that include significantly

more old and large trees than are currently present, the preferred action alternative ultimately chosen by the Service seeks to achieve these conditions using commercial thinning to log large trees up to 24 inches in diameter at breast height ("DBH"), or even 30 inches DBH in some cases. Perplexingly, in the three EAs published between 2016 and 2018, the Service never considered a version of the Project that would seek to achieve the desired conditions without logging any of the few large trees present in the region. Rather, the Service strode further from the Project's original purpose and need in its final EA, reducing the desired quantity of large trees in the project area from 22 per acre to 14, thus substantially increasing the intensity of commercial logging of large trees. The Service only made this change after offering the final opportunity for public comment.

Among the members of plaintiffs Earth Island Institute and Center for Biological Diversity (collectively "Earth Island") are passionate forestry experts and advocates seeking to facilitate substantive discourse between the public and the government so that they may assist the Forest Service in applying the most current science to the environmental challenges of the twenty-first century— namely, fire management. After participating at every stage of the Project's environmental review process, Earth Island filed this lawsuit in 2019, including claims challenging both the Service's failure to consider a reasonable range of alternatives in its 2018 EA and its failure to offer an opportunity for the interested

3

public to comment on the revisions included in the 2018 EA. These claims are brought under the regulations promulgated by the Council on Environmental Quality ("CEQ") implementing the National Environmental Policy Act ("NEPA"), the Forest Service's regulations governing the Pre-Decisional Administrative Review Process ("objection process"), and the Administrative Procedure Act ("APA").

While the parties were briefing cross-motions for summary judgment before the district court, there was an outbreak of bark beetles in the Project area, resulting in widespread tree mortality and leading the Forest Service to remove two units from the Project area, reducing the Project's size by 559 acres. Notably, the area removed from the Project constituted 90 percent of what the Service had previously designated—in each of the three EAs it published—as protected or "enhanced" habitat for the Pacific marten. The Service categorizes the Pacific marten as a sensitive species that prefers habitat with large trees and snags (standing dead trees), as well as large downed trees. While the Service asserted in its earlier EAs that the Project would have few impacts on martens, this assumption was tied to the fact that martens are only found in the designated marten units. Now, the Service is implementing a new project—the Inyo Craters Area Bark Beetle Mortality Hazard Abatement Project ("Inyo Craters Project")—that will remove some the few remaining large trees in the same or immediately

adjacent areas without updating its NEPA analysis for the Three Creeks Project to consider how the two projects will cumulatively impact the environment, including the area's deficit of large trees generally and the Pacific marten specifically.

The Service's failure to supplement its NEPA analysis in response to these significant new circumstances is emblematic of its environmental review of the Three Creeks Project as a whole. Rather than addressing the environmental information and controversy before it, the Forest Service has circumvented procedural requirements in order to avoid taking the "hard look" at the Project's environmental consequences that NEPA requires. As a result, the Service is now proceeding to log old and large trees in a region that it admits is in dire need of such trees, without ever having considered whether it could achieve the Project's goals without logging those trees or whether the introduction of another project logging old and large trees changes the environmental backdrop.

## STATEMENT OF CASE

### Statement of Facts

The Forest Service proposed the Three Creeks Project with a scoping notice in 2012. 3-ER-529–33. In this notice, the Service recognized that the forest stands in the Project are "often lacking in larger, older, more fire-resilient trees" due to the Service's policies in previous decades—notably "[f]ire suppression and harvesting practices." 3-ER-529. Earth Island participated in this scoping period,

responding to the Service's proposal with numerous scientific studies, some of which highlighted the ecological importance of wildland fires and the environmental impacts of fire suppression. 3-ER-517–28.

Between 2016 and 2018, the Service published three EAs. In March of 2016, the Service published a draft EA ("2016 EA"), 3-ER-433–516, on which Earth Island submitted additional comments, 3-ER-412–32. The 2016 EA explained that action is needed because the project area does not meet desired pre-European settlement conditions where "the overall appearance was of a forest dominated by older, larger trees" and stands "averag[ed] 22 large trees per acre and 147 square feet of basal area" where "[v]ery large trees, exceeding 40 inches dbh and 100 feet in total height, were common."[1] 3-ER-440. Further, in the desired pre-settlement conditions, the "risk of large-scale, high-intensity, stand-replacing fire was extremely low." 3-ER-440–41. The 2016 EA described a project area currently dominated by smaller trees and where large trees are "rare, non-existent, or have recently died," and there is a greater likelihood of "high-intensity, stand-replacing fires" than would be present in the desired conditions. 3-ER-441–42. This draft EA analyzed two alternatives—the proposed action and a "no action" alternative. 3-ER-446–59. The former proposed to use commercial thinning, prescribed fire, and fuels treatments to achieve the desired pre-settlement conditions. This proposed

---

[1] Basal area refers to the sum per acre of the cross-sectional area of tree trunks.

action described a majority of the trees being logged as mature trees between 10–20 inches DBH, with an unspecified number of large trees over 24 inches DBH also being removed, including the possibility of removing "hazard" trees over 30 inches DBH. 3-ER-446. Earth Island's comments on the 2016 EA further emphasized the relative ineffectiveness of commercial thinning, which includes logging of larger trees, as a method for addressing the risk of high severity wildfire, the historical ecological benefits of fire, and the negative environmental impacts of commercial thinning. 3-ER-412–32.

The Service published a second draft EA in July of 2017 ("2017 EA"), 3-ER-308–411, that was largely unresponsive to Earth Island's comments, describing the same desired conditions and once again analyzing only one action alternative that relies heavily on commercial thinning, including logging some of the "very few live trees greater than 24 inches dbh." 3-ER-316, 322. During the subsequent objection process, Earth Island submitted an objection raising the issue of 2017 EA's failure to consider an adequate range of alternatives, 2-ER-303–04. Specifically, Earth Island's objection highlighted the Service's failure to consider additional action alternatives that would achieve the Project's purpose and need "while mitigating impacts to Sensitive Species—such as prescribed fire, wildland fire use, and/or precommercial thinning of trees under 8 inches in diameter." 2-ER-303–04.

Following the objection process, the Service published its final EA in January of 2018 ("2018 EA") along with a decision notice stating a finding of no significant impact ("FONSI"). 2-ER-188–291, 174–87. Despite considering the same two alternatives—the proposed action and a "no action" alternative—the 2018 EA was significantly different than the previous two EAs, including a further increase in the number of large trees that would be logged, and new discussion of the Project's potential impacts on the black-backed woodpecker and Pacific marten. 2-ER-228–29, 245–46. Earth Island and other interested members of the public were never given an opportunity to comment on these changes in the 2018 EA.

The Service recognizes the Pacific marten as a sensitive species[2] that prefers habitat with large trees, snags, and downed logs. 2-ER-225, 231. Accordingly, in each of the three EAs, the preferred action alternative included designating three stands within the Project area as marten units, 3-ER-450, 327–28; 2-ER-207–08, in which the Service intended to only employ silvicultural treatments that would

_____

[2] The Forest Service in the Inyo National Forest Land Management Plan (2019) now refers to "sensitive species" as "species of conservation concern." 36 C.F.R. § 219.9(c). In practice, these classifications are essentially the same: the Forest Service must ensure, through its management plans, that certain environmental conditions are maintained as necessary to preserve the viability of species of conservation concerns. *Id.* § 219.9(b)(1). For consistency, Earth Island will refer to the Pacific marten as a sensitive species, the designation used in the Sierra Nevada Forest Plan Amendment (2004), under which the Service proposed and finalized the Project. *See* 2-ER-192.

protect or enhance marten habitat, 2-ER-225. Although the Service recognized that the Project's implementation outside of these three units would reduce marten habitat quality, the Service claimed that the Project as a whole would not impact martens because they were assumed not to use habitat outside of the marten units. 2-ER-227.

In the summer of 2020, a bark beetle infestation caused widespread tree mortality affecting 520 acres, and 220 acres within the project area. 2-ER-94. The Service issued a supplemental information report ("SIR"), 2-ER-92–101, that included the Service's decision to remove the affected units from the Project area, which included the removal of two of the Project's three marten units. 2-ER-99–101. Without addressing whether the bark beetle outbreak and resulting tree mortality could change the distribution of Pacific martens in the Project area, the Service concluded that the new information did not warrant supplemental NEPA analysis. 2-ER-99–101. In the 2020 SIR, the Service also noted that the bark beetle kill could necessitate silvicultural treatments in the affected area and explained that "[a]ny future proposals or projects, if developed, will be analyzed as required under NEPA." 2-ER-101. On June 14, 2021, the Service proposed such a project— the Inyo Craters Bark Beetle Hazard Tree Abatement project ("Inyo Craters Project"). 2-ER-84. The scoping notice for the Inyo Craters Project proposed to cut and remove hazard trees—without any limitation on size—on up to 950 acres in

the units formerly included in the Three Creeks Project and the surrounding area. 2-ER-84. The scoping notice indicated the Inyo Craters Project would be approved using categorical exclusions, 36 C.F.R. § 220.6(d)(3)–(4), 2-ER-85. Forest Service regulations do not require that the NEPA analysis of categorically excluded actions consider the cumulative impacts of other, adjacent or overlapping projects. *See* 36 C.F.R. § 220.6(b) (list of extraordinary circumstances that does not include cumulative impacts).

**Procedural History**

Earth Island initiated this action in July, 2019, seeking vacatur, injunctive relief, and declaratory relief. 2-ER-147–73. After the parties had filed cross-motions for summary judgment and were in the course of briefing those motions, the Service published the 2020 SIR considering the impacts of the bark beetle outbreak on the Three Creeks Project. 2-ER-92–101. On November 25, 2020, Earth Island then filed an unopposed Motion to Amend the Complaint, 2-ER-140–43, which the district court granted on June 9, 2021. 2-ER-138–39. Earth Island subsequently filed a First Amended Complaint ("FAC") on June 11, 2021, adding two new claims alleging the Service's failure to comply with NEPA in considering the possible impacts of the bark beetle outbreak on its environmental review of the Three Creeks Project. 2-ER-107–37. The Forest Service announced the Inyo Craters Project three days after this filing on June 14, 2021. 2-ER-84. Both parties

then filed supplemental cross-motions for summary judgment. On September 9, 2022, the district court issued final judgment granting the Service's motions for summary judgment on all twelve claims and denying Earth Island's cross-motions. 1-ER-3–32.

## SUMMARY OF THE ARGUMENT

Applying de novo review, this Court should reverse the district court's grant of the Forest Service's motion for summary judgment and denial of Earth Island's cross-motion on the three issues on appeal. First, the Service acted arbitrarily, capriciously, and in violation of the CEQ's implementing NEPA regulations when it analyzed only two alternatives in its 2018 EA for the Three Creeks Project and refused to consider the viable alternatives offered by Earth Island. In its comments on the 2016 EA and its objections to the 2017 EA, Earth Island exhausted this issue by suggesting multiple ways in which the Service could meet Project's purpose and need while reducing the Project's impacts on the environment. Nonetheless, the Service did not include any discussion of alternatives other than the proposed action and a "no action" alternative in the 2018 EA.

Second, the Service has violated both the CEQ's NEPA regulations and its own objection process regulations by failing to offer an opportunity for public comment on its revised 2018 EA that was based on new information and changed circumstances. The 2018 EA is substantively distinct from the prior EAs in both

how it describes the Project's desired conditions and how it seeks to achieve those conditions, yet neither Earth Island nor the interested public have been able to offer the Service comments on these major changes. Under the APA, the Court should compel the Service to offer an additional opportunity for public comment as agency action unlawfully withheld.

Finally, the Service violated the CEQ's NEPA regulations by failing to supplement its 2018 EA after the bark beetle outbreak in 2020 and the subsequent announcement of the Inyo Craters Project. Although the Service published an SIR in October of 2020, this document alone cannot satisfy the agency's obligation to respond to significant new circumstances or information. Additionally, the 2020 SIR does not consider the Inyo Craters Project nor does it consider how that project combined with the Three Creeks Project will cumulatively impact the environment in the project area and adjacent areas, including the cumulative impacts on local species that depend on habitat provided by large trees. The Forest Service proposed to approve the Inyo Craters Project using a categorical exclusion, which would not require the agency to consider the cumulative impacts of both the adjacent or overlapping Three Creeks Project and Inyo Craters Project on the area's already existing deficit of large trees. Under the APA, the Court should compel the agency to conduct this additional NEPA analysis that has been unlawfully withheld.

# ARGUMENT

Given that the Forest Service's compliance with NEPA is central to each of the three issues presently on appeal, NEPA's underlying principles should guide the Court's analysis. Broadly, NEPA requires federal agencies to take a "hard look" at a proposed action's environmental consequences. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1045 (9th Cir. 2013). Under this framework, agencies are required to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a) (2018).[3] Public scrutiny is essential to NEPA's implementation and its procedures are designed to ensure that environmental information be made available to public officials and citizens before decisions are made and actions are taken. *Id*. § 1500.1(b). Thus, NEPA ensures that an agency will both carefully consider detailed information regarding a project's significant environmental impacts and that this information is made available to the public. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.* ("*N. Plains*"), 668 F.3d 1067, 1072 (9th Cir. 2011). This obligation to both engage in informed decision-making and foster informed public participation is the

---

[3] The CEQ's regulations implementing NEPA at 40 C.F.R. §§ 1500–1508 are binding on all federal agencies. Earth Island is citing to the NEPA regulations that were in force when the NEPA analysis for the Project began and was completed in 2018. While the CEQ amended its regulations effective September 2020, *see* 40 C.F.R. § 1506.13 (2020), the new regulations are not retroactive and the Service's NEPA analysis must comply with the 2018 CEQ regulations. *See Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2020).

"touchstone" of a court's inquiry into whether an agency has complied with NEPA. *See California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

Procedurally, NEPA provides two avenues for achieving compliance. First, an agency must prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C) (2023). Second, an agency may prepare an Environmental Assessment ("EA") to decide whether it will be necessary to prepare an EIS. 40 C.F.R. § 1501.4(b). Importantly, an EA needs to "provide sufficient evidence and analysis" in order to support the agency's subsequent decision to prepare either an EIS or a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1).

Earth Island has brought this suit under the APA's cause of action because NEPA does not include an independent enforcement provision. *See Env't Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 871 (9th Cir. 2022). Under section 706 of the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(1)–(2). Generally, judicial review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

**I.  The Forest Service failed to consider a reasonable range of alternatives and explain why it excluded viable alternatives from consideration.**

Earth Island presented the Service with viable alternatives to the Service's preferred action alternative that would have eliminated the logging of large trees from the Project's design while relying more heavily on prescribed fire, wildland fire use, and precommercial thinning, 2-ER-303–04; yet, the Service did not analyze these alternatives in the 2018 EA nor explain why such alternatives did not warrant consideration. NEPA requires federal agencies to give full and meaningful consideration to all reasonable alternatives in an EA. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). *See also* 42 U.S.C. § 4332(2)(E) (requiring that agencies "study, develop, and describe appropriate alternatives to recommend courses of action"); 40 C.F.R. § 1507.2(d) (the requirement to "[s]tudy, develop, and describe alternatives…extends to all such proposals, not just…[environmental] impact statements"). This requirement includes an analysis of alternatives that "will avoid or minimize" a proposal's adverse effects. 40 C.F.R. § 1500.2(e); *see also W. Watersheds Project*, 719 F.3d at 1050, 1053. Failure to consider a reasonable range of alternatives in an EA is arbitrary, capricious, and not in accordance with NEPA's implementing regulations, in violation of 5 U.S.C. § 706(2)(A).

**A. Standard of Review & Preservation of Issues for Appeal**

Earth Island raised this issue in its Complaint, 2-ER-165–66, FAC, 2-ER-127–28, Motion for Summary Judgment, 2-ER-144–46, and Amended Motion for Summary Judgment, 2-ER-88–90. The district court ruled on the parties' cross-motions for summary judgment on this issue in its order and final judgment. 1-ER-20–21; 1-ER-2. This Court reviews de novo a district court's grant or denial of a motion for summary judgment. *Env't Defense Ctr.*, 36 F.4th at 871.

**B. Earth Island exhausted this issue before the Forest Service.**

Earth Island sufficiently exhausted the issue of the Service's failure to consider a reasonable range of alternatives during their participation in the public notice and comment process for the Three Creeks Project. In the 2016 EA, the Service did not consider an alternative that would both take action to achieve the Project's desired conditions without logging any of the area's remaining old or large trees, 3-ER-446–59, and Earth Island accordingly commented on that EA's scientific deficiencies in this regard, 3-ER-412–32. Then, when the subsequent 2017 EA also failed to incorporate Earth Island's comments by considering any such alternatives, 3-ER-322–39, Earth Island explicitly raised viable alternatives in their objection to the 2017 EA, 2-ER-303–04. The Service responded by asserting that because neither Earth Island nor other members of the public raised specific alternatives in their previous comments, it was justified in analyzing two

alternatives, the preferred action alternative and a "no action" alternative. 2-ER-298. In the 2017 EA, the Service chose not to incorporate Earth Island's comments on the 2016 EA into additional alternatives; it cannot now claim that its failure to consider such alternatives is rationalized by a lack of specific requests made by members of the public. Furthermore, the Service made substantive changes in the 2018 EA that it published after Earth Island filed its objection, *see* discussion *infra* Part II, and thus could have also expanded on its consideration of alternatives.

The Service's NEPA obligations extend far beyond merely responding to concerns raised by members of the public. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 765 (2004) ("The agency bears the primary responsibility to ensure that it complies with NEPA."). Nonetheless, the APA requires that plaintiffs exhaust administrative remedies before filing suit. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846 (9th Cir. 2013); 5 U.S.C. § 706. In the NEPA context, this means that plaintiffs "must 'structure their participation so that it…alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Public Citizen*, 541 U.S. at 764. The Ninth Circuit "ha[s] repeatedly held that the exhaustion requirement should be interpreted broadly." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010). Plaintiffs may raise arguments during judicial review of an agency action if underlying comments, submitted

during the administrative process, provided enough clarity for the decisionmaker to understand the issue raised. *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010); *see also Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1161 (D. Or. 2011) ("[P]laintiffs also can satisfy the exhaustion requirement merely by making a general objection under a statute to an agency action without referencing any specific violations of that statute.") (internal quotes omitted); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1208 (9th Cir. 2004) (parties must alert the agency to its position and claims). The exhaustion doctrine gives agencies the opportunity "to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process." *Great Old Broads for Wilderness*, 709 F.3d at 846.

In *'Ilio'ulaokalani Coalition v. Rumsfeld*, NEPA plaintiffs did not participate in the comment period offered by the agency for the relevant EIS, yet this Court held that the plaintiffs did not waive their right to challenge the agency's consideration of alternatives. 464 F.3d 1083, 1091–92 (9th Cir. 2006). Rather, the dispositive factor was that the agency was aware of the defect that the plaintiffs were alleging. *Id.* Similarly interpreting the exhaustion requirement, this Court in *Native Ecosystems Council v. Dombeck* held that the plaintiffs sufficiently raised their concern about the agency's decision to waive a road density standard by asserting generally that the underlying timber sale violated NFMA requirements

and raising concerns that the sale would result in too much open space, without ever mentioning road density specifically. 304 F.3d 886, 899–900 (9th Cir. 2002).

Here, Earth Island's comments on the 2016 EA sufficiently raised concerns regarding the risks of removing medium and large trees and the ineffectiveness of commercial thinning, which removes many such mature trees, as to inform the Forest Service that its consideration of alternatives was inadequate. 3-ER-412 (Project "proposes to remove large, live, old trees, and old-growth trees"); 3-ER-424–28 (Service should not remove large trees that are necessary for species); 3-ER-430–31 (commercial thinning of larger trees is ineffective for reducing fire intensity, and can actually increase fire intensity; fire itself is the only way to reduce future fire intensity). Although Earth Island did not make an explicit request that specific alternatives be considered, its description of the proposed action alternative's shortcomings—namely, the ineffectiveness of thinning and the impacts of large tree removal—directly highlighted what areas of the EA's consideration of alternatives were deficient, and the alternate courses of action that could be taken to meet the stated purpose of the project while avoiding unnecessary adverse impacts from large tree removal. Earth Island provided the Service with relevant information, and the Service was then put on notice to either incorporate it into additional alternatives or explain why such information should

not have been considered in additional alternatives. *See* discussion *infra* Section I.C.

Further, Earth Island explicitly raised viable alternatives before the Service during the objection process. The Service's regulations describing its procedures for both notice and comment public participation and the objection process contemplate that comments will raise issues related to the proposed action with supporting reasons, while objections should allege specific legal deficiencies in agency documents and offer the Service suggestions for remedying said deficiencies. *Compare* 36 C.F.R. § 218.2 ("[C]omments should be within the scope of the proposed action, have a direct relationship to the proposed action, and must include supporting reasons for the responsible official to consider."), *with id.* § 218.8(d)(5) ("[A]n objection must include…[a] description of those aspects of the proposed project addressed by the objection, including specific issues related to the proposed project; if applicable, how the objector believes the environmental analysis or draft decision specifically violates law, regulation, or policy; suggested remedies that would resolve the objection…"). Therefore, Earth Island acted in accordance with the Service's regulations when it first offered comments on the 2016 EA raising concerns with the action alternative's scientific underpinnings, 3-ER-412 (disputing the 2016 EA's assertions that fire severity is increasing in the area), 3-ER-419–22 (offering evidence that "[h]istorical mixed-conifer

20

forests…often had dense understories"), before then submitting objections to the

2017 EA that alleged specific violations of law, 2-ER-303–04 (alleging that the

2017 EA failed to analyze a reasonable range of alternatives by only analyzing one

action alternative). Earth Island's objection further complied with the Service's

regulations by offering specific remedies to the alleged unreasonable consideration

of alternatives; Earth Island suggested analyzing alternatives utilizing only

prescribed fire in lieu of commercial thinning, only removing small trees less than

8 inches in diameter (i.e. pre-commercial thinning) in lieu of removing medium

and large trees, and/or using wildland fire. 2-ER-303–04. Therefore, Earth Island

adequately alerted the Service to their position that it was not considering a

reasonable range of alternatives and gave the Service the opportunity to give the

issue meaningful consideration. *See Public Citizen*, 541 U.S. at 764.[4] The Service's

failure to analyze any of Earth Island's proposed alternatives or explain its decision

not to do so violated NEPA. *See W. Watersheds Project*, 719 F.3d at 1050, 1053.

---

[4] As discussed below**,** *infra* Part II, the Service made significant changes to the final 2018 EA, so it has no basis for arguing that Earth Island's suggested specific alternatives, offered before the 2018 EA was published, came too late in the process.

**C. The Forest Service's consideration of alternatives in the 2018 EA was arbitrary and capricious because it did not analyze an adequate range of alternatives and failed to explain why it did not consider viable alternatives offered by Earth Island.**

The Service's consideration of alternatives in the 2018 EA was arbitrary, capricious, and in violation of NEPA because the Service failed to give Earth Island's proposed alternatives—reducing the logging of large trees by relying more heavily prescribed fire, wildland fire use, or the precommercial thinning of trees under 8 inches in diameter—meaningful analysis or provide a meaningful explanation as to why these alternatives were not viable. Granting the Service's motion for summary judgment on this claim, the district court relied exclusively on *Earth Island Institute v. U.S. Forest Service*, 1-ER-20–21, where this Court stated that under the current standard applicable to an EA's consideration of alternatives, it has never found an EA that considered only a no-action and preferred action alternative arbitrary and capricious. 697 F.3d 1010, 1022 (9th Cir. 2012). This dicta in *Earth Island Institute* detracts from important procedural requirements that apply to an agency's consideration of alternatives and overlooks cases where this Court has applied these requirements to find EAs considering *more* than two alternatives arbitrary and capricious. Therefore, the Court should take this opportunity to clarify this issue and create instructive Ninth Circuit precedent.

### 1. NEPA's Basic Requirements for Considering Reasonable Alternatives

NEPA mandates that an agency "shall to the fullest extent possible" use the environmental review process "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e). In doing so, agencies must analyze and compare a full spectrum of viable alternatives. *See* CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981). "The existence of a viable but unexamined alternative renders an EA inadequate." *W. Watersheds Project*, 719 F.3d at 1050 (internal quotations omitted); *see also Env't Defense Ctr.*, 36 F.4th at 877 ("Agencies do not have to consider infinite, unfeasible, or impractical alternatives, but they must consider reasonable ones."). Therefore, an agency's decision to "not consider such an alternative, without adequate explanation, shows that it did not take the hard and careful look…that is required by NEPA." *W. Watersheds Project*, 719 F.3d at 1053.

### 2. Earth Island's proposed alternatives are viable because they meet the Project's purpose and need, they are distinguishable from the alternatives considered by the Service, and they would achieve different results.

The Service cannot at this juncture assert that Earth Island's proposed alternatives do not warrant such consideration or analysis. First, an agency cannot

offer post-hoc rationalizations supporting its NEPA compliance that were not included in its final EA. *Env't Defense Ctr.*, 36 F.4th at 878. Thus, any explanation given by the Service's appellate counsel is irrelevant. *See id.* Additionally, an agency is only excused from analyzing alternatives that do not meet the project's purpose and need, *see Western Watersheds Project*, 719 F.3d at 1050, 1053, or "are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir.1990)).

The 2018 EA's proposed action alternative for the Three Creeks Project primarily utilizes a combination of commercial thinning and prescribed fire to meet the Project's purpose and need "to manage the selected Jeffrey pine…units through promoting forest health by increasing resiliency to wildfire, drought and pathogens, and for restoration and improvement of a variety of habitat types." 2-ER-194, 199. The Forest Service described the desired conditions for the area as a return to pre-settlement conditions, characterized by domination of "older, larger trees, generally exceeding 24 inches" in diameter. 2-ER-196. Expanding on their comments on the 2016 EA, Earth Island objected to the 2017 EA, arguing that the Service failed to consider any reasonable alternatives that would achieve the Project's desired conditions and preserve the few, remaining old or large trees by

using only prescribed fire, wildland fire, or precommercial thinning of trees under eight inches in diameter. 2-ER-303–04. In its response to Earth Island's objection, the Service declined to consider any of the suggested alternatives, asserting that neither Earth Island nor other members of the public raised specific alternatives in their previous comments, 2-ER-298, and ultimately considered only the proposed action alternative and no action alternative in the final 2018 EA. 2-ER-202. Contrary to the Service's assertion in its objection response, after Earth Island's 2016 comments and 2017 objections confirmed that the Service was aware[5] that the Project's purpose and need could be met without logging large trees in the Project area, the Service was obligated to either evaluate such alternatives in the final EA or give an "adequate explanation" as to why the agency did not include such an evaluation. *See W. Watersheds Project*, 719 F.3d at 1053.

Due to its very similar facts, *Environmental Protection and Information Center v. U.S. Forest Service* ("*EPIC*"), 234 Fed. Appx. 440 (9th Cir. 2007), also should be looked to as persuasive authority emphasizing the proper application of these standards. In that case, the Service prepared an EA for a tree-thinning project

---

[5] It is primarily an agency's responsibility to comply with NEPA, s*ee Public Citizen*, 541 U.S. at 765; 40 C.F.R. § 1500.2(e). Unlike the situation in *Public Citizen,* the combination of Earth Island's 2016 comments and 2017 objection and NEPA's well-established requirement that agencies must consider reasonable alternatives put the Forest Service on notice before it finalized its NEPA analysis and before it made its decision that such compliance included an obligation to explore additional alternatives.

with the stated purposes of reducing the risk of fire and encouraging old growth by removing underbrush and small trees, as well as covering the project's costs by commercially logging some trees greater than 12 inches. *Id.* at 443. This EA only considered two alternatives: the preferred alternative and a "no action" alternative. *Id.* During the public comment process, the plaintiffs proposed an alternative that would not remove mature trees larger than twelve inches in diameter and would not include any commercial thinning of such trees. *Id.* The Service dismissed this alternative, merely stating that it was inconsistent with the project's purpose and need, which the agency claimed could only be met by the Service's preferred one. *Id.* The court held that the cursory explanation supporting the Service's refusal to analyze the alternative provided by the plaintiffs violated NEPA's requirement that an agency must give alternatives "full and meaningful consideration." *Id.* (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005)).

As in *EPIC*, the Service here cannot argue that Earth Island's proposed alternatives will not meet the Project's purpose and need. In fact, by aiming to return the Project area to pre-settlement conditions without removing any of the remaining old or large trees, Earth Island's proposed alternatives may be better suited to the Project's purpose and need than the Service's preferred action alternative.

Beyond meeting the Project's purpose and need, Earth Island's proposed alternatives are otherwise viable, given that they merely involve relying on a subset of the actions included in the Service's preferred alternative. *See* 2-ER-202. *EPIC* further endorses the viability of Earth Island's proposed alternatives, as in that case the court held that the Service's failure to explain why it did not consider a proposed thinning alternative that restricted the thinning to trees less than twelve inches in diameter violated NEPA's requirement that an agency analyze viable alternatives that are consistent with the objectives of its proposed action. *See* 234 Fed. Appx. at 442–443.[6] This is very similar to Earth Island's suggested alternative that the Service exclusively utilize precommercial thinning to remove trees less than eight inches in diameter. 2-ER-303. Moreover, the Ninth Circuit has recently recognized the significant environmental impact that can occur when larger trees are logged in thinning projects, as such actions can increase, not decrease, wildfire severity, according to a large body of scientific evidence. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 870–71 (9th Cir. 2020).

Additionally, the alternatives proposed by Earth Island are distinguishable from the single action alternative analyzed by the Service that involved using commercial thinning and removing some of the few remaining large trees. 2-ER-

---

[6] The court was not persuaded by the Service's argument that using commercial logging to cover the project's costs was central to the project's purpose and need. *EPIC*, 234 Fed. Appx. at 443–444.

202. Rather, Earth Island's proposed alternatives would preserve the remaining large trees by relying entirely on prescribed fire, wildland fire use, or precommercial thinning of trees less than eight inches in diameter. 2-ER-303. Additionally, these alternatives would not have "substantially similar consequences" because they would avoid logging any large trees and therefore would mitigate impacts to sensitive species, 2-ER-303, including the Pacific marten, which "prefer[s] coniferous forest habitat with large diameter trees and snags, large down logs, moderate-to-high canopy closure, and an interspersion of riparian areas and meadows." 2-ER-231. If the Service disagrees, then it must revise its EA to include an explanation of why it excluded these alternatives from consideration. *See W. Watersheds Project*, 719 F.3d at 1052.

### 3. The Forest Service violated NEPA by failing to give an adequate explanation for excluding the viable alternatives proposed by Earth Island from meaningful consideration.

In 2022, this Court in *Environmental Defense Center* found that an EA considering three action alternatives and a "no action" alternative was inadequate because the agencies did not give any alternatives proposed by the plaintiffs meaningful analysis nor provide an explanation as to why these alternatives did not warrant meaningful analysis. 36 F.4th at 877. *Environmental Defense Center* serves as a powerful counterpoint to the aforementioned dicta in *Earth Island Institute*, 697 F.3d at 1022, highlighting why the suggestion that an agency

considering a "no action" and preferred action alternative will always be deemed sufficient is misleading. Notably, in *Earth Island Institute*, the Ninth Circuit upheld the Service's consideration of two alternatives, explaining that the Service "ha[d] offered a reasonable explanation for how its preferred alternative better accomplished its goal…than Plaintiffs' proposed alternative." *Id.* Thus, despite this Court's recognition in *Earth Island Institute* that an analysis of two alternatives had, at that time, been uniformly deemed sufficient in published opinions, this observation does not eliminate the requirement that agencies consider alternatives and explain their decision to eliminate certain options. *See, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1218–19 (decided before *Earth Island Institute* and held that an EA considering five alternatives failed to properly evaluate all reasonable alternatives); *W. Watersheds Project*, 719 F.3d at 1050 (decided after *Earth Island Institute* and held that an EA considering four alternatives failed to properly evaluate all reasonable alternatives, particularly one that reduced environmental impacts).

Here, the Service did not even reference Earth Island's proposed alternatives in the 2018 EA, let alone give a meaningful explanation for not considering them. *See* 2-ER-188–291. Like in *Environmental Defense Center*, where this Court found the agencies' consideration of alternatives inadequate because it did not give the plaintiffs' proposed alternatives meaningful analysis nor offer an explanation as to

why these alternatives did not warrant meaningful analysis, *see* 36 F.4th at 877, the

Court here should hold that the Service's failure to consider Earth Island's

proposed alternatives, without explanation, violated NEPA.

II.    **The Forest Service's failure to offer an opportunity to comment on the 2018 EA violated both NEPA and the Service's objection process regulations.**

Based on Service's objection process regulations as well as NEPA's goal of

public scrutiny, the Service improperly denied the public a chance to comment on

the revised 2018 EA that included major changes based on new information.

### A. Standard of Review & Preservation of Issues for Appeal

Earth Island raised this issue in its Complaint, 2-ER-170–71, FAC, 2-ER-

132–33, Motion for Summary Judgment, 2-ER-144–46, and Amended Motion for

Summary Judgment, 2-ER-88–90. The district court ruled on the parties' cross-

motions for summary judgment on this issue in its order and final judgment. 1-ER-

2, 28–29. This Court reviews de novo a district court's grant or denial of a motion

for summary judgment. *Env't Defense Ctr.*, 36 F.4th at 871.

### B. NEPA's regulations require public scrutiny.

The CEQ's NEPA regulations recognize that public scrutiny is central to the

environmental review process by requiring agencies to encourage and facilitate

public involvement. 40 C.F.R. §§ 1500.1(b), 1500.2(d). When conducting

environmental reviews, agencies must make diligent efforts to involve the public to

the "extent practicable." *Id.* at §§ 1506.6(a), 1501.4(b). In doing so, agencies must

"[p]rovide public notice of NEPA-related hearings, public meetings, and the

availability of environmental documents so as to inform those persons and

agencies who may be interested or affected." *Id.* § 1506.6(b). This includes

"[s]olicit[ing] appropriate information from the public." *Id.* § 1506.6(d). Public

commenting procedures are the heart of the NEPA process. *California v. Block*,

690 F.2d at 770; *see also Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*,

674 F. Supp. 2d 783, 792 (S.D.W. Va. 2009) (commenting is also the heart of an

EA). Whether an agency adequately involved the public "is a fact-intensive inquiry

made on a case-by-case basis." *ForestKeeper v. Elliot*, 50 F. Supp. 3d 1371, 1387

(E.D. Cal. 2014) (alteration in original) (quoting *NRDC v. U.S. Forest Serv.*, 634 F.

Supp. 2d 1045, 1067 (E.D. Cal. 2007)).

Notably, courts in this Circuit require agencies to offer opportunities for

public comment on EAs even where it is not explicitly required by the CEQ's

broadly applicable NEPA regulations. *See Ctr. for Biological Diversity v. Gould*,

150 F. Supp. 3d 1170, 1181–83 (E.D. Cal. 2015). Applying the CEQ's regulations,

this Court has held that "[a]n agency, when preparing an EA, must provide the

public with sufficient environmental information, considered in the totality of the

circumstances, to permit members of the public to weigh in with their views and

thus inform the agency decision-making process." *Bering Strait Citizens for*

*Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir.

2008). Under this standard, the sufficiency of environmental information depends

on how it "permit[s] the public to weigh in with their views." *Id.* at 953. In *Gould*,

the court applied the *Bering Strait* standard to hold that the Forest Service failed to

offer adequate opportunities for public involvement when it did not publish its

Wilderness Analysis until after the closure of the draft EA comment period. 150 F.

Supp. 3d at 1183. Although the Service initially acted in accordance with its own

regulations by providing opportunities for the public to comment and objection on

its initial draft EAs, it did not provide such an opportunity on the revised EA that it

published in 2018 in light of new information. Therefore, the Service ultimately

fell short of fully complying with its own regulations and NEPA's underlying

principles, which the aforementioned cases demonstrate are judicially-enforceable

in this Circuit.

### C. The Forest Service's objection process requires that it offer an opportunity for public comment on EAs revised in light of new information or changed circumstances.

Going beyond the CEQ's NEPA regulations applied in *Bering Strait* and

*Gould*, the Forest Service's objection regulations affirmatively require the agency

to provide an opportunity to comment on EAs. 36 C.F.R. § 218.22(a). Similarly,

these regulations also require the Service to offer an opportunity for public

comment when the Forest Service prepares a supplemental or revised EA after

consideration of "new information or changed circumstances." *Id.* § 218.22(d).

This requirement is distinct from the Service's regulations requiring a project's responsible official to respond to objections and address concerns before signing a final decision notice. *Id.* § 218.12(a)–(b). When issuing these regulations, the Service responded to commenters concerned about projects undergoing changes between the objection process and the final decision notice by explaining that "major changes should generally not be made to draft decision documents without good cause or without an opportunity for additional public involvement before decisions are signed." Predecisional Administrative Review Process, 78 Fed. Reg. 18481, 18489 (Wednesday, March 27, 2013) (codified at 36 C.F.R. pt. 218). Therefore, the Service cannot argue that the 2018 EA differed from the previous EAs merely because responsible official needed to respond to objections and address concerns; the document included major changes that the public must be allowed to consider in an additional opportunity for comment.

Despite applying different NEPA regulations than those which apply here, this Court's analysis in *California v. Block* is informative of how an agency's discretion to finalize an action after receiving public comments should be balanced against the public's desire to comment on a proposed action in its final form. *See* 690 F.2d at 770–72. Recognizing that "agencies must have some flexibility modify…the draft EIS to reflect input," the court explained that an agency cannot

publish a final EIS substantially different than the draft EIS that it circulated because this would "seriously dilute[e]" the relevance of the public's comments on the draft EIS. *Id*. The Court here should apply this same reasoning, while employing the Service's stringent regulations, to ultimately conclude that the major changes made in the 2018 EA seriously diluted the relevance of public's input on the earlier EAs.

The Forest Service prepared three EAs for the Three Creeks Project. *See* 2-ER-188–291; 3-ER-308–411, 433–516. Earth Island submitted a comment on the 2016 EA, 3-ER-412–32, and objected to the 2017 EA, 2-ER-301–06. However, after receiving the Forest Service's response to their objection, Earth Island requested the agency file a supplemental EA, or EIS, and allow public comment on the new information and circumstances that should be addressed in the supplemental EA or EIS, based on the vague instructions in the Forest Service's objection response. 2-ER-292–93; *see also* 2-ER-294–300. The Forest Service ultimately filed a new EA, the 2018 EA, which made major changes to 2016 and 2017 EAs without giving Earth Island or other members of the interested public on opportunity to voice their concerns. The 2018 EA included changes to the Project area's desired forest conditions, the methods the Service intended to use to achieve these conditions, and the Service's discussion of the black-backed woodpecker and the Pacific marten.

First, the 2018 EA altered the Project area's desired forest conditions as well as how the Forest Service would achieve these conditions. Discussing the desired conditions of the 2016 and 2017 EAs, the Forest Service states it wants to achieve a basal area around 147 square feet per acre and maintain 22 large trees per acre. 3-ER-316, 440. The 2018 EA changed these desired conditions, stating that the Service intends to achieve a basal area between 70–152 square feet per acre and maintain only 14 large trees per acre; the 2018 EA also—for the first time— includes the desired overall trees per acre, 39–79 trees, and states the desired mean tree diameter is 22 inches. 2-ER-196. The Forest Service did not include an explanation in the 2018 EA for why it changed the desired conditions between the EAs to allow far more removal of large trees.

Second, the 2018 EA also made major changes to the methods the Forest Service will use to achieve these desired conditions. The 2016 and 2017 EAs note that the vast majority of trees to be cut are medium-sized mature trees between 10–20 inches in diameter. 3-ER-322, 446. The 2018 EA, however, for the first time, states that the vast majority of trees to be cut are below 10 inches in diameter, but that the majority of *merchantable* trees to be cut are between 10–20 inches in diameter. 2-ER-202. Earth Island should have been given an opportunity to comment on the 2018 EA and address these changes, including the chance to point out that an alternative that does not include commercial logging of larger trees is

even more viable and reasonable after these changes. Not only do these changes constitute "new information or changed circumstances" that require additional public comment under 36 C.F.R. § 218.22(d), they also indicate that the Service generally failed to involve the public to the "extent practicable" when preparing EAs for the Three Creeks Project. *See* 40 C.F.R. § 1501.4(b). Promoting the Project area's forest structure, composition, and density conditions were the overarching objective of the Project when it was first announced in 2012, 3-ER-529, yet the Service took six years between 2012 and publication of its self-proclaimed final EA in 2018 to finalize the conditions it desired for the project area and how it intended to achieve those conditions. The public cannot reasonably be expected to participate in an environmental review process with the understanding that the Service may substantially change its course after the final comments have been collected and thus avoid that change being scrutinized.

Third, the 2018 EA includes new information about the black-backed woodpecker and Pacific marten. The 2018 EA for the first time recognized the black-backed woodpecker as a management indicator species for wildlife dependent upon snags and included additional information regarding its habitat needs and possible indirect effects to the species' habitat from planned removal of snags. 2-ER-228–29, 245–46. When discussing impacts to the Pacific marten, the 2018 EA included a very brief discussion of the recent Moriarty study, 2-ER-228,

which Earth Island discussed in its objection, 2-ER-302 & 306 n.20. However, the

Forest Service improperly analyzed this study, using it to support the assertion that

the proposed action's commercial thinning would improve marten habitat, 2-ER-

228, conveniently ignoring the study's overall conclusion that martens tend to

avoid areas subjected to such commercial thinning. 2-ER-302 & 306 n.20.

Although Earth Island raised both of these issues in its objection to the 2017 EA,

by incorporating both of these issues in a very limited and misleading manner in

the 2018 EA, the Service did not allow Earth Island to meaningfully comment on

the Service's application of this crucial environmental information. The Forest

Service's refusal to provide an opportunity to comment on the 2018 EA diluted the

relevance of the public's earlier comments and thus circumvented the heart of the

NEPA process. By neither providing the public with environmental information

central to its implementation of the Three Creeks Project during the comment

periods nor offering an additional comment period once this information came to

light, the Forest Service violated both NEPA and its own regulations at 36 C.F.R. §

218.22(d).

## III. The Forest Service violated its ongoing NEPA obligations by failing to supplement its NEPA analysis for the Three Creeks Project in response to the bark beetle outbreak and its subsequent announcement of the Inyo Craters Project.

An agency is required to supplement its NEPA analysis when "there are

significant new circumstances or information relevant to environmental concerns

and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)

(2018)[7]; *see also Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th

Cir. 2000) ("[T]he Forest Service's failure to evaluate in a timely manner the need

to supplement the original EIS in light of that new information violated NEPA.");

*Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)

(holding that the duty to undertake supplemental analysis also applies to a

supplemental EA). Such supplemental NEPA analysis is necessary when the new

information bears on the "human environment in a significant manner or to a

significant extent not already considered." *Friends of the Clearwater*, 222 F.3d at

557–58. An agency cannot rest on its original NEPA analysis; rather, the agency

has an ongoing obligation to "be alert to new information that may alter the results

of its original environmental analysis." *Id.* at 557. This duty to consider new

information includes "reasonably foreseeable" cumulative impacts that would

otherwise be a part of an agency's impacts analysis. *See N. Plains*, 668 F.3d at

1077–78 (agency failed to analyze "possible cumulative impacts from reasonably

foreseeable" projects). An agency's failure to publish a supplemental EA or EIS in

---

[7] The SIR itself cites to the 2020 regulations. *See* 2-ER-93. Although Earth Island believes the controlling regulation is in fact 40 C.F.R. § 1502.9(c) (2018), *see supra* note 3, because the old and new regulations impose exactly the same legal obligations, *see* 40 C.F.R. § 1502.9(d) (2020), this Court will likely never have to resolve this issue.

light of significant new information is contrary to law. *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 561–62 (9th Cir. 2006). When an agency fails to prepare supplemental NEPA analysis, plaintiffs may seek to "compel agency action unlawfully withheld or unreasonably delayed" under the APA. 5 U.S.C. § 706(1).

NEPA and the CEQ's implementing regulations do not specify how an agency should determine whether a change constitutes "significant new circumstances or information," but courts have upheld the use of SIRs as an appropriate method for agencies to determine whether they must supplement their existing NEPA analysis. *Alexander*, 222 F.3d at 565–66. When condoning the use of SIRs, this Court has been clear that such reports cannot by themselves satisfy the need for supplemental NEPA analysis. *Id.* at 566. Rather, a finding of potentially significant new circumstances or information in an SIR triggers an agency's obligation to supplement its NEPA analysis. *Id.* Therefore, when potentially significant new circumstances or information arise, an agency must both consider the need for additional NEPA analysis in an SIR and then perform such analysis, pursuant to all applicable regulations.

### A. Standard of Review & Preservation of Issues for Appeal

Earth Island raised this issue in its FAC, 2-ER-134–35, and Amended Motion for Summary Judgment, 2-ER-88–90. The district court ruled on the

parties' cross-motions for summary judgment on this issue in its order and final judgment. 1-ER-2, 30–31. This Court reviews de novo a district court's grant or denial of a motion for summary judgment. *Env't Defense Ctr.*, 36 F.4th at 871.

### B. The Forest Service Failed to Satisfy Its Ongoing Obligation to Supplement Its NEPA Analysis.

The 2020 bark beetle outbreak, the resulting changes to the Three Creeks Project, and the subsequent announcement of the Inyo Craters Project have presented the Service with multiple instances of significant new circumstances and information; yet, the Service has repeatedly fallen short of its ongoing obligations under NEPA to both adequately consider these circumstances and information and conduct the required supplemental analysis. The Service first addressed the bark beetle outbreak by publishing the 2020 SIR, where it concluded that supplemental NEPA analysis was not necessary. 2-ER-101. This decision was arbitrary and capricious both because the 2020 SIR's removal of the marten units from the Project constituted significant new circumstances and because the Project, as altered in response to the bark beetle outbreak, is outside the range of alternatives considered in the 2018 EA.

Then, when the Service announced the Inyo Craters Project in June 2021, 2-ER-83–87, it triggered the Forest Service's ongoing obligation to both consider whether significant new circumstances or information required supplemental NEPA analysis and ultimately prepare such analysis. That Project proposed to fell

and entirely remove numerous, additional large dead and dying trees from the

Three Creeks Project area and immediately adjacent areas. 2-ER-84–85. However,

the Service has never published any such consideration, which constitutes agency

action unlawfully withheld under the APA. The Forest Service proposed to

approve the Inyo Craters Project using a categorical exclusion, 2-ER-85, but the

Forest Service's regulations do not require the documentation for categorically

excluded projects to include any consideration of cumulative impacts from

previously approved projects in the same or nearby areas. *See* 36 C.F.R. § 220.6(b)

(list of extraordinary circumstances that does not include cumulative impacts).

However, the bark beetle outbreak, the Inyo Craters Project, and the Three Creeks

Project will have cumulative impacts well beyond what was considered in the 2018

EA. Most notably, the two projects will impact the distribution of old and large

trees across the Three Creeks project area and the overlapping and immediately

adjacent Inyo Craters project area, as well as the species that depend on these trees.

1. **The Forest Service failed to supplement its NEPA analysis to address significant new circumstances and information resulting from the bark beetle outbreak.**

Although the Service published a SIR in October of 2020 considering

whether the bark beetle outbreak warranted supplemental NEPA analysis, its

decision to not prepare a supplemental EA or EIS was arbitrary and capricious.

While agencies need not supplement "every time new information comes to light"

they must take a "hard look" and consider new information that bears on the "human environment in a significant manner or to a significant extent not already considered." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton* ("*LOWD/BMBP*"), 752 F.3d 755, 760 (9th Cir. 2014). This is a "low standard" where plaintiffs need not show that significant effects will in fact occur, but only that new information or project changes raise substantial questions regarding whether new significant impacts will occur. *Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 562.

### i. The removal of the marten units from the Three Creeks Project area required supplemental NEPA analysis.

Specifically, the bark beetle outbreak's effects on the Pacific marten presented the Service with significant new circumstances and information. When an agency relies on a project plan provision related to wildlife conservation in its environmental review and that provision is subsequently removed, the agency must undertake supplemental NEPA analysis. *See LOWD/BMBP*, 752 F.3d at 761.

In its 2018 EA, the Service concluded that the Project was expected to have "little direct or indirect impact on martens" because they do not use much of the Project area. 2-ER-227. However, the Service recognized that the three marten units were an exception where "marten use has been well documented and habitat quality is generally high." 2-ER-227. The Service described its intention to manage these units in a manner that would "protect or enhance" the 623 acres of marten

42

habitat. 2-ER-225. Then, in the 2020 SIR, the Service announced that it would be removing two of the three previously designated marten units from the Three Creeks Project area, resulting in a reduction of 559 acres, or ninety percent. 2-ER-100. Although the Service admits the bark beetle outbreak caused impacts beyond what was considered in the Final EA, the Service failed to revise the 2018 EA's analysis of the Project's impacts on the Pacific marten. 2-ER-100 ("[T]he mortality in these units has caused a reduction in marten habitat quality beyond what was considered in the EA…."); 2-ER-101 ("A correction, supplement, or revision to the environmental assessment or decision is not necessary because the effects are within the scope and range of effects as originally analyzed in the environmental assessment and do not result in any new or significant impacts."). In fact, in the 2020 SIR the Service continues to assume that marten "rarely use Project areas outside of the three identified units," 2-ER-100, despite the fact that 90 percent of those three units is no longer going to be protected as previously planned. Rather, the Service notes that the marten habitat affected by the bark beetle outbreak is "rapidly deteriorating into low quality habitat," 2-ER-99, but never contemplates whether it is biologically realistic that the resident martens will now all occupy the remaining 10 percent of marten habitat. The SIR also does not consider whether martens will continue to occupy the areas that are now targeted for logging in the Inyo Craters project, or will be using new areas, within the Three Creeks project

area, that they were not using previously, and thus would be subject to entirely new impacts not previously considered.

In *LOWD/BMBP*, the Forest Service withdrew a Travel Management Plan ("TMP"), which "regulate[d] off-road motorized travel and reduce[d] the amount of roads within the Forest," that the Service had relied upon in its EIS for "addressing environmental harms from the logging project," including potential adverse impacts on elk. 752 F.3d at 759, 761 (TMP would "result in a substantial improvement in elk security habitat"). Finding that an SEIS was likely required to evaluate the project's effects on elk without the TMP, this Court explained that "[a]lthough parts of the USFS' analysis do not consider the TMP, as a whole, its review of the Snow Basin project's independent environmental impacts on elk and their habitat are interwoven with statements that explicitly rely upon the TMP to mitigate harms that the Snow Basin project will cause." *Id.* at 761. As in *LOWD/BMBP*, the Service here eliminated portions of the project intended to strategically limit a project's impact on wildlife habitat—there elk, here marten. Moreover, in this case, the Service's discussion of the beneficial effects of protecting and enhancing habitat in the marten units is interwoven with its discussion of how the Protect will impact marten habitat broadly. *Compare* 2-ER-227 (Project would have "little direct or indirect impact on martens" because they do not use much of the Project area), *with* 2-ER-227 (in the three marten units

"marten use has been well documented and habitat quality is generally high"").

Consistent with *LOWD/BMBP*, the Service must publish a supplemental EA that

independently analyzes the effects of the Three Creeks Project on the Pacific

marten, in light of new information and changed circumstances and without relying

on the plan provisions rendered obsolete by the bark beetle outbreak.

### ii. The Project's effects are no longer within the range of alternatives considered in the 2018 EA after being revised in response to the bark beetle outbreak.

Furthermore, the bark beetle outbreak and the Service's subsequent changes

to the Project have resulted in effects outside of the range of alternatives

considered in the 2018 EA. Under 40 C.F.R. § 1502.9(c), supplemental NEPA

analysis is required when a project change falls "qualitatively [outside] the

spectrum of alternatives that were discussed in the draft [EA]." *Russell Country

Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011). The 2018 EA

only considered two alternatives: a "no action" alternative and one action

alternative that included the 623 acres of marten habitat protection and

enhancement. 2-ER-202–19. As a consequence, the public has never had the

opportunity to comment on a version of the Three Creeks Project without ninety

percent of the originally proposed marten habitat protection and enhancement, and

new logging of key marten habitat structures, especially snags, planned within

those very acres. While the 2018 EA does mention beetle outbreaks, it explains

that outbreaks were not occurring in the Inyo Forest at significant rates. 2-ER-192

("pine beetle outbreak has not been experienced on the Inyo to the [same degree

as]...forests on the western side of the Sierra"). Such limited discussion does not

constitute a "hard look" analysis of the "rapidly accelerating" beetle mortality. The

Service admits that the beetle kill "has caused a reduction in marten habitat quality

beyond what was considered in the EA." 2-ER-100. Therefore, the Service must

publish a supplemental EA or EIS that considers the Project as modified in

response to the bark beetle outbreak.

> **2. Beyond failing to supplement its NEPA analysis, the Forest Service has failed to even consider whether the Inyo Craters Project—specifically its cumulative impacts—warranted such supplemental analysis.**

> **i. Earth Island's amended complaint filed with the district court was pleaded sufficiently broadly to encompass the Service's failure to consider the Inyo Craters Project because the Service generated the claim's underlying facts.**

As an initial matter, the Service's failure to analyze the Inyo Craters Project

specifically as part of its NEPA analysis for the Three Creeks Project was properly

pleaded before the district court. Rule 8 of the Federal Rules of Civil Procedure

establishes a "notice pleading" standard that requires a plaintiff give the defendant

"fair notice" of their legal claim and enable the opposing party to defend itself

effectively. *Starr v. Baca*, 652 F.3d 1202, 1213, 1216 (9th Cir. 2011). When an

agency generates facts itself, it cannot later claim that it was unaware of those

facts. *See Friends of the Clearwater*, 222 F.3d at 558–59; *see also Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 653–54 (9th Cir. 2015) (concluding that ESA notice was sufficient where the agency itself possessed the information it claimed to not have sufficient notice of). "Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." *Friends of the Clearwater*, 222 F.3d at 559 (quoting *Davis v. Coleman*, 521 F.2d 661, 667 (9th Cir. 1975)). "It is the agency, not an environmental plaintiff, that has a 'continuing duty to gather and evaluate new information relevant to the environmental impact of its actions,' even after release of an EIS." *Id*.

Following the Service's publication of its 2020 SIR, Earth Island amended its complaint to add a claim alleging that the Service did not satisfy its duty to supplement its NEPA analysis in response to "significant new circumstances or information" and thus provided the Service with the requisite legal and factual notice to respond to this claim. 2-ER-134–35. The legal basis for the claim is clear: the Service did not perform supplemental NEPA analysis required under 40 C.F.R. § 1502.9(c)(1), constituting a "failure to act" under Section 706(1) of the APA.

The fact that the Inyo Craters Project was not announced until after Earth Island filed its FAC is immaterial because it is within the scope of the claim

alleging that the "[2020 SIR] fail[ed] to take a hard look at impacts from the significant new circumstances relevant to environmental concerns caused by the bark beetle outbreak." 2-ER-135. The Forest Service was certainly already aware of the details surrounding the proposed Inyo Craters Project, because the Inyo Craters Project was itself proposed by the Forest Service. *See* 2-ER-84 (Inyo Craters scoping letter from Forest Service dated June 14, 2021, three days after Earth Island filed its FAC). In *Friends of the Clearwater v. Dombeck*, this Court specifically upheld the ability of environmental plaintiffs to support their claim alleging the Forest Service's failure to prepare supplemental NEPA analysis by raising new facts not alleged in their complaint. 222 F.3d at 558–59. As is the case here, those new facts were all readily available and known to the Service because they were "generated by the Forest Service itself," and thus it was irrelevant "[t]hat the plaintiffs did not specifically identify this new information as the basis for their demands until after they sued the Forest Service." *Id*. Therefore, the Inyo Craters Project is both "significant new circumstances relevant to environmental concerns caused by the bark beetle outbreak," 2-ER-136, and "information generated by the Forest Service itself," *see Friends of the Clearwater*, 222 F.3d at 559. In fact, a sister project such as the Inyo Craters Project was specifically anticipated by the Forest Service in the 2020 SIR when it stated that "the Forest [sic] may

subsequently propose treatment under a new project in the near future in these same units." 2-ER-101.

### ii. The Forest Service violated its NEPA obligations by failing to consider whether the Inyo Craters Project warranted supplemental NEPA analysis.

An agency's failure to evaluate new information in a timely manner to determine whether a supplemental EA or EIS is required is itself a violation of NEPA. *Friends of the Clearwater*, 222 F.3d at 559. Even if new information is "not so definitive as to compel initiation of the formal supplementation process," it still may "raise[] sufficient environmental concerns to require the [agency] to take another hard look at the issues." *Warm Springs Dam Task Force v. Gribble* ("*Warm Springs*"), 621 F.2d 1017, 1025 (9th Cir.1980). Further, the Forest Service's own NEPA handbook instructs the agency to "review [new] information carefully" and to "document the results" of that review, neither of which appears to have been done here. 2-ER-80 (Forest Service NEPA Handbook at 1909.15 § 18.1). *See also Friends of the Clearwater*, 222 F.3d at 555 (recognizing that SIRs are the Forest Service's "formal instruments for documenting whether new information is sufficiently significant to trigger the need for [a supplemented NEPA analysis]").

In *Friends of the Clearwater*, this Court found that the Service violated NEPA when the agency failed to evaluate new information to assess the need for

49

additional NEPA analysis. 222 F.3d at 554, 558. The court observed that "[a]lthough the Forest Service now can point to data that, if timely considered, would have shown that the new information did not require an SEIS, this does not demonstrate that the Forest Service complied with NEPA, which demands timely and reasoned agency action." *Id*. at 558.

Here, the Forest Service's own October 2020 SIR was expressly limited to the new information that existed then—the beetle kill—and acknowledged that it might propose "treatment under a new project" and that such a proposal could trigger additional NEPA obligations. 2-ER-101. The Inyo Craters Project is precisely such a proposal. And like *Friends of the Clearwater*, where this Court found that the Service violated NEPA by failing to consider whether new information warranted supplemental NEPA analysis, the Inyo Craters Project is of the Service's own conception, "not buried in a report prepared by another agency," 222 F.3d at 559, and the Service was likely aware of this information well before it publicly announced the project on June 14, 2021. 2-ER-84. Although the Inyo Craters Project was not explicitly mentioned in the 2020 SIR, the Service did acknowledge that "[a]ny future proposals or projects, if developed, will be analyzed as required under NEPA." 2-ER-92–101. Although the 2020 SIR analyzed how the tree mortality would impact martens in both the revised Three Creeks Project area and the area now encompassed by the Inyo Craters Project, 2-

ER-99, it did not address how any future logging related to this mortality could affect marten habitat or the overall cumulative impact on the area's existing deficit of large trees. The SIR notes the "reduction in habitat quality due to the current mortality event," but fails to consider how the Inyo Craters Project will compound these effects. 2-ER-99. Notably, "the presence of some snags and downed logs improves marten habitat," 2-ER-99–100, yet the scoping notice for the Inyo Craters Project states this additional project would fell and remove even more large dead or dying trees from the area. 2-ER-84–85.

In *Warm Springs*, this Court held an agency's actions unlawful under NEPA where the subject matter of the new information that arose actually was discussed in the agency's NEPA analysis, but a new study, released after the EIS was completed, indicated the need for further scrutiny in order for the agency to satisfy NEPA's requirement that new information be evaluated. 621 F.2d at 1025. The court explained that:

> When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures. Reasonableness depends on such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.

*Id.* at 1024. Here, the Service's failure to evaluate the Inyo Craters Project is patently unreasonable because it did not even consider the new information presented by that project, much less support its decision not to supplement its prior NEPA analysis. The October 2020 SIR specifically noted that such consideration might be necessary in light of future projects. 2-ER-101. The Forest Service was clearly aware of the connection between the two projects, noting in the Inyo Craters Project scoping notice that "[t]he area containing this proposed project was previously included in the Three Creeks Jeffrey Pine Forest Health and Restoration Project." 2-ER-85. The Service generated new information and unreasonably failed to "consider it, evaluate it, and make a reasoned determination whether it" required supplemental NEPA analysis.[8] *Warm Springs*, 621 F.2d at 1024.

---

[8] Further indicating the Service's failure to consider the Inyo Craters Project's significance is the Service's decision not to include the Inyo Craters Project's scoping notice in the supplemental record that it was ordered to file in response to Earth Island amending its complaint to include a claim alleging the Service's failure to consider the significant new information relevant to the bark beetle outbreak. 2-ER-102–03 (Index of supplemental AR), 2-ER-104–06 (Court's order). The Service published the scoping notice for the Inyo Craters Project on June 14, 2021—three days after Earth Island filed its FAC—yet still failed to include this project's NEPA documentation in the Supplemental Record filed fifteen days later on June 29, 2021.

### iii. Specifically, the cumulative impacts of the Three Creeks Project and the Inyo Craters Project require supplemental NEPA analysis.

To comply with NEPA, an agency must evaluate both direct and indirect effects of a proposed action, taking into consideration cumulative impacts of the action "when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.[9] "It is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now…." *N. Plains*, 668 F.3d at 1078. Rather, "projects need not be finalized before they are reasonably foreseeable." *Id.*

In order for the Service to determine here whether the effect of removing large trees as part of the Three Creeks Project is significant when combined with the effects of removing large trees as part of the neighboring Inyo Craters Project, the cumulative impacts analysis must take place during the review of the earlier project. 40 C.F.R. §§ 1508.25(a)(2), 1508.7 ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."). A supplemental EA is required to meet this demand, yet the Service failed

---

[9] Recognizing that revised regulations altering the required cumulative impacts analysis went into effect on September 14, 2020, 40 C.F.R. § 1506.13 (2020), Earth Island maintains that the applicable regulations are those which were in force when the environmental review of the Three Creeks Project began. *See supra* note 3.  Moreover the requirement to consider cumulative imapcts was restored on May 20, 2022. *See* 40 C.F.R. § 1508.1(g) (2022); National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23453 (Apr. 20, 2022).

to prepare even an SIR. Removing large trees, including large snags needed by imperiled martens, as part of the Inyo Craters Project will further reduce the number of large trees not only in the two marten units, but in the area surrounding the Three Creeks Project as well, which is already severely lacking large and old trees due to prior logging practices emphasizing the logging of old, large-diameter trees. 2-ER-193, 197; 2-ER-86 (Inyo Craters Project Map). Included in the Three Creeks Project's very purpose and need is the need to restore the area to "pre-settlement conditions," which includes the need to increase the number of large, old trees on the landscape. 2-ER-195.

With respect to the Pacific marten—and other species that require large trees, both standing and on the ground—not only will the two dropped units not be enhanced as part of the Three Creeks Project, those areas and other areas around them will now be more heavily logged than under that original project. 2-ER-92. *Compare* 2-ER-225 ("Only minimal tree removal would occur…."), *with* 2-ER-84 (plans to remove "dead and dying trees" afflicted by the beetle kill), and 2-ER-94 ("The recently killed trees are mostly greater than 12 inches (up to the largest trees)…."). One of the primary purposes of the Three Creeks projects was to "restor[e] and improve[] a variety of habitat types[,]" 2-ER-194, that are "dominated by larger trees[.]" 2-ER-183. As noted in the 2018 EA, marten require habitat with "large diameter trees and snags, large down logs" and "moderate-to-

high canopy closure." 2-ER-231. Despite this, the Three Creeks Project already allowed for the logging of large trees up to 30 inches in diameter, with an anticipated overall effect "to reduce…canopy closure." 2-ER-202, 225. This substantial change and subsequent impact on marten must be analyzed before the Three Creeks project is fully implemented.

The Seventh Circuit addressed this very question of when an agency must supplement its analysis of cumulative impacts in light of a new project in *Habitat Education Center, Inc. v. U.S. Forest Service*, recognizing that "if new information about a future project becomes clear while the current projects are pending, and that information significantly alters the previously presented environmental landscape, the agency would be required to issue a supplement to its…final [EA]." 673 F.3d 518, 529–30 (7th Cir. 2012) (citing 40 C.F.R. § 1502.9(c)(1)); *see also Alexander*, 222 F.3d at 566 (holding duty to undertake Supplemental analysis also applies to Supplemental EA). The court in *Habitat Education Center* ultimately found that the Service was not required to supplement its NEPA analysis in light of a newly proposed project for two reasons. 673 F.3d at 529–30. First, the preceding project's impacts analysis took a "hard look" at the possibility that a future project would alter the present cumulative impacts analysis. *Id.* Second, the first project's environmental review made clear that the future project would include the first project in its cumulative impacts analysis as a past action. *Id.* at 530.

Here, the Court should apply this standard to the Service's failure to either include the reasonably foreseeable impacts of the Inyo Craters Project in its SIR or prepare an additional SIR following the publication of the Inyo Craters Project proposal. Unlike *Habitat Education Center*, where the Service took a "hard look" at how future projects could alter its present cumulative impacts analysis, the Service's cumulative impacts analysis in the 2018 EA only contemplated "a reduction of [marten] habitat quality on up to 75 acres," 2-ER-243–44, and the Service in its 2020 SIR merely stated that "[a]ny future proposals or projects, if developed, will be analyzed as required under NEPA." 2-ER-101. Additionally, whereas the future project in *Habitat Education Center* included the first project in its cumulative impacts analysis as a prior action, the scoping notice for the Inyo Craters Project proposed to approve it using a categorical exclusion, 2-ER-85, and Forest Service regulations do not require the documentation for projects approved using categorical exclusions to consider the cumulative impacts of nearby or adjacent projects. *See* 36 C.F.R. § 220.6(b) (list of extraordinary circumstances to consider that does not include the cumulative impacts of earlier, nearby or adjacent projects); *see generally* 36 C.F.R. § 220.6. Unless the Service analyzes the two projects' cumulative impacts during its environmental review of the Three Creeks Project, these impacts will not be considered.

Therefore, the Service violated its ongoing obligations to supplement its NEPA analysis in light of the bark beetle outbreak and subsequent announcement of the Inyo Craters Project. In doing so, the Service has overlooked the projects' cumulative impacts on species like the Pacific marten, directly circumventing NEPA's core principle of informed decision-making.

## CONCLUSION

For the above reasons, the Court should reverse the district court's decision to grant the Forest Service's motion for summary judgment on the three aforementioned issues and order the district court to enter judgment in favor of Earth Island and to vacate the Forest Service's 2018 Decision Notice approving the Three Creeks Project. 2-ER-174-87.

Respectfully submitted this 9th day of March, 2023.

/s/ Thomas Buchele
Thomas Buchele
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
(503) 768-6736
tbuchele@lclark.edu

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** No. 22-16751

I am the attorney or self-represented party.

**This brief contains __13,445__ words,** including __0___ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Thomas Buchele_____ **Date** 03/09/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                      *Rev. 12/01/22*

# REGULATORY ADDENDUM

**Federal Regulations**

36 C.F.R. § 218.2 (2018) ........................................................................ A-2

36 C.F.R. § 218.8(d)(5) (2018) .............................................................. A-3

36 C.F.R. § 218.12(a) (2018) ................................................................. A-5

36 C.F.R. §§ 218.22(a), (d) (2018) ........................................................ A-6

36 C.F.R. § 220.6(b) (2023) .................................................................. A-7

36 C.F.R. §§ 220.6(d)(3)–(4) (2023) ..................................................... A-8

40 C.F.R. § 1500.1(b) (2018) ................................................................ A-9

40 C.F.R. § 1500.2(d)–(e) (2018) .......................................................... A-10

40 C.F.R. § 1501.4(b) (2018) ................................................................ A-11

40 C.F.R. § 1502.9(c)(1) (2018) ............................................................ A-12

40 C.F.R. § 1502.9(d) (2020) ................................................................ A-13

40 C.F.R. § 1506.13 (2020) ................................................................... A-14

40 C.F.R. § 1506.6 (2018) ..................................................................... A-15

40 C.F.R. § 1507.2(d) (2018) ................................................................ A-16

40 C.F.R. § 1508.1(g) (2020) ................................................................ A-17

40 C.F.R. § 1508.1(g) (2022) ................................................................ A-18

40 C.F.R. § 1508.7 (2018) ..................................................................... A-19

40 C.F.R. § 1508.9 (2018) ..................................................................... A-20

## 36 C.F.R. § 218.2 (2018)

*Definitions*
_____

The following definitions apply to this part:

…

**Specific written comments**. Written comments are those submitted to the responsible official or designee during a designated opportunity for public participation (§ 218.5(a)) provided for a proposed project. Written comments can include submission of transcriptions or other notes from oral statements or presentation. For the purposes of this rule, specific written comments should be within the scope of the proposed action, have a direct relationship to the proposed action, and must include supporting reasons for the responsible official to consider.

…

*Filing an objection.*

———————————

…

(c) Issues raised in objections must be based on previously submitted specific written comments regarding the proposed project or activity and attributed to the objector, unless the issue is based on new information that arose after the opportunities for comment. The burden is on the objector to demonstrate compliance with this requirement for objection issues (see paragraph (d)(6) of this section).

(d) At a minimum, an objection must include the following:

(1) Objector's name and address as defined in § 218.2, with a telephone number, if available;

(2) Signature or other verification of authorship upon request (a scanned signature for electronic mail may be filed with the objection);

(3) When multiple names are listed on an objection, identification of the lead objector as defined in § 218.2. Verification of the identity of the lead objector must be provided upon request or the reviewing officer will designate a lead objector as provided in § 218.5(d);

(4) The name of the proposed project, the name and title of the responsible official, and the name(s) of the national forest(s) and/or ranger district(s) on which the proposed project will be implemented;

(5) A description of those aspects of the proposed project addressed by the objection, including specific issues related to the proposed project; if applicable, how the objector believes the environmental analysis or draft decision specifically violates law, regulation, or policy; suggested remedies that would resolve the objection; supporting reasons for the reviewing officer to consider; and

(6) A statement that demonstrates the connection between prior specific written comments on the particular proposed project or activity and the

content of the objection, unless the objection concerns an issue that arose after the designated opportunity(ies) for comment (see paragraph (c) of this section).

…

**36 C.F.R. § 218.12(a) (2018)**

*Timing of project decision.*

———————

(a) The responsible official may not sign a ROD or DN subject to the provisions of this part until the reviewing officer has responded in writing to all pending objections (see § 218.11(b)(1)).

(b) The responsible official may not sign a ROD or DN subject to the provisions of this part until all concerns and instructions identified by the reviewing officer in the objection response have been addressed.

…

**36 C.F.R. §§ 218.22(a), (d) (2018)**

*Proposed projects and activities subject to legal notice and opportunity to comment.*

———————

The legal notice and opportunity to comment procedures of this subpart apply only to:

    (a) Proposed projects and activities implementing land management plans for which an environmental assessment (EA) is prepared;

    …

    (d) A proposed project or activity for which a supplemental or revised EA or EIS is prepared based on consideration of new information or changed circumstances; and

    …

*Categorical Exclusions*

———————

(b) ***Resource Conditions.***

(1) Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:

(i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;

(ii) Flood plains, wetlands, or municipal watersheds;

(iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;

(iv) Inventoried roadless area or potential wilderness area; (v) Research natural areas;

(vi) American Indians and Alaska Native religious or cultural sites; and

(vii) Archaeological sites, or historic properties or areas.

(2) The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist.

# 36 C.F.R. §§ 220.6(d)(3)–(4) (2023)

*Categorical Exclusions*

––––––––––––

(d) ***Categories of actions for which a project or case file and decision memo are not required.*** A supporting record and a decision memo are not required, but at the discretion of the responsible official, may be prepared for the following categories:

…

(3) Repair and maintenance of administrative sites. Examples include but are not limited to:

> (i) Mowing lawns at a district office;
>
> (ii) Replacing a roof or storage shed;
>
> (iii) Painting a building; and
>
> (iv) Applying registered pesticides for rodent or vegetation control.

(4) Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:

> (i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road;
>
> (ii) Grading a road and clearing the roadside of brush without the use of herbicides;
>
> (iii) Resurfacing a road to its original condition;
>
> (iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and
>
> (v) Surveying, painting, and posting landline boundaries.

…

# 40 C.F.R. § 1500.1(b) (2018)

## *Purpose*

---

…

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

…

*Policy*

———————

Federal agencies shall to the fullest extent possible:

    …

    (d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

    (e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

    …

**40 C.F.R. § 1501.4(b) (2018)**

*Whether to prepare an environmental impact statement.*
_____

In determining whether to prepare an environmental impact statement the Federal agency shall:

…

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

…

# 40 C.F.R. § 1502.9(c)(1) (2018)

### *Draft, final, and supplemental statements.*

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

…

(c) Agencies:

> (1) Shall prepare supplements to either draft or final environmental impact statements if:
>
>> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>>
>> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.
>
> …

**40 C.F.R. § 1502.9(d) (2020)**

*Draft, final, and supplemental statements.*

———————

…

(d) ***Supplemental environmental impact statements***. Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

**40 C.F.R. § 1506.13 (2020)**

*Effective date.*

---

The regulations in this subchapter apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020.

**40 C.F.R. § 1506.6 (2018)**

*Public involvement.*
_____

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

…

(d) Solicit appropriate information from the public.

…

# 40 C.F.R. § 1507.2(d) (2018)

*Agency ability to comply.*

———————

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to evaluate what others do for it. Agencies shall:

…

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of section 102(2)(E) extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.

…

*Definitions.*

———————

…

(g) ***Effects or impacts*** means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

> (1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

> (2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action.

> (3) An agency's analysis of effects shall be consistent with this paragraph (g). Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed.

…

# 40 C.F.R. § 1508.1(g) (2022)

*Definitions.*

————————

…

(g) ***Effects or impacts*** means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

…

# 40 C.F.R. § 1508.7 (2018)

*Cumulative impact.*

———————————

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

# 40 C.F.R. § 1508.9 (2018)

*Environmental assessment.*

-------------

*Environmental assessment*:

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.