No. 22-16751

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

EARTH ISLAND INSTITUTE and CENTER FOR BIOLOGICAL DIVERSITY,
*Plaintiffs – Appellants*,

v.

UNITED STATES FOREST SERVICE and MARGIE B. DEROSE,
*Defendants – Appellees*.

**APPELLANTS EARTH ISLAND INSTITUTE and CENTER FOR BIOLOGIAL DIVERSITY'S REPLY BRIEF**

On Appeal from the United States
District Court for the Eastern District of California,
Honorable Morrison C. England, Jr.
Case No: 2:19-cv-01271-MCE-DB

Thomas C. Buchele
OR Bar No. 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
tbuchele@lclark.edu

Andrew B. Baloga
Certified Law Student

*Attorney for Plaintiffs-Appellants*

TABLE OF CONTENTS


INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................ 2

I. The Service failed to consider a reasonable range of alternatives and explain why it excluded viable alternatives from consideration. ...................................... 3

A. Earth Island exhausted this issue before the Service, given that the Service's administrative proceedings include the objection process. ................ 4

1. The Service's objection process regulations and their statutory authority preclude the Court from applying any prudential issue exhaustion requirements. ........................................................................................ 5

2. *Public Citizen* does not apply strict limitations on the scope of the Court's issue exhaustion analysis because the Service's regulations do not impose any such limitations and the facts of that case are distinguishable. ... 7

B. Earth Island complied with the Service's objection process regulations when it filed its objections. ......................................................................... 11

C. The Service's consideration of alternatives in the 2018 EA was arbitrary and capricious because it did not analyze an adequate range of alternatives and failed to explain why it did not consider viable alternatives offered by Earth Island. ..................................................................................................... 12

II. The Service's failure to offer an opportunity to comment on the 2018 EA violated both the CEQ's NEPA implementing regulations and the Service's objection process regulations. ....................................................................... 16

III. The Service violated its continuing NEPA obligations by failing to supplement its NEPA analysis for the Three Creeks Project in response to the bark beetle outbreak and its subsequent announcement of the Inyo Craters Project. ..................................................................................................... 20

A. The Service failed to supplement its NEPA analysis to address significant new circumstances and information resulting from the bark beetle outbreak. 21

B. Beyond failing to supplement its NEPA analysis after the bark beetle outbreak, the Service has failed to even consider whether the Inyo Craters Project—including its cumulative impacts—warranted supplemental analysis. ........ 23

1. Earth Island's amended complaint filed with the district court was pleaded sufficiently broadly to encompass the Service's failure to consider the Inyo Craters Project primarily because the Service generated the claim's underlying facts. ........ 24

2. The Service violated its NEPA obligations by failing to consider whether the Inyo Craters Project warranted supplemental NEPA analysis addressing the two projects' cumulative impacts. ........ 27

CONCLUSION ........ 29

CERTIFICATE OF COMPLIANCE ........ 31

TABLE OF AUTHORITIES

CASES

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584 (9th Cir. 2018) ........ 8

*California v. Block,* 690 F.2d 753 (9th Cir. 1982) ........ 18

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ........ 4, 7, 8, 10

*Earth Island Inst. v. U.S. Forest Serv.*, ("*Earth Island*"), 697 F.3d 1010 (9th Cir. 2012) ........ 14, 15

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ........ 12, 14

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ........ passim

*Habitat Educ. Ctr. v. U.S. Forest Serv.*, 673 F.3d 518 (7th Cir. 2012) ........ 28, 29

*Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991) ........ 9

*Havasupai Tribe v. United States*, 752 F. Supp. 1471 (D. Ariz. 1990) ........ 9

*Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) ........ 3, 21

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006) ........ 21

*Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645 (9th Cir. 2015) ........ 25, 26

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ........ 8

*LOWD/BMBP v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ........ 23

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)............................................ 21

*N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006)........................ 15

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, ("*NICAN*"), 545 F.3d 1147 (9th Cir. 2008) ........................................................................... 8, 26

*Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010) .......... 18

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) .. 15

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008)....................... 26

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, ("*Price Rd.*"), 113 F.3d 1505 (9th Cir. 1997) ........................................................................ 20, 21

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)....................... 3

*Ross v. Blake*, 578 U.S. 632 (2016) ........................................................................ 6

*Sierra Club v. Tahoe Reg'l Plan. Agency*, 916 F. Supp. 2d 1098 (E.D. Cal. 2013). 6

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) ........................... 3

*Sims v. Apfel*, 530 U.S. 103 (2000)......................................................................... 5

*Starr v. Baca*, 652 F.3d 1202, 1213 (9th Cir. 2011)............................................... 24

*Vasquez-Rodriguez v. Garland*, 7 F.4th 888 (9th Cir. 2021).................................... 6

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)....................... 4, 15

*Warm Springs Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980).................. 25

STATUTES

16 U.S.C. § 6515(c)(2) ........................................................................................ 6

5 U.S.C. § 704 ........ 5

5 U.S.C. § 706(2)(A) ........ 4, 20

Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, § 428, 125 Stat. 1046 (2011) (codified at 16 U.S.C. § 6515 note) ........ 6, 10

OTHER AUTHORITIES

Project-Level Predecisional Administrative Review Process, 78 Fed. Reg. 18481 (Mar. 27, 2013) (codified at 36 C.F.R. pt. 218) ........ 9, 12

The Bluebook: A Uniform System of Citation (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) ........ 16

TREATISES

33 Charles Alan Wright et al., *Federal Practice and Procedure: Judicial Review of Administrative Action* (2018) ........ 5

REGULATIONS

36 C.F.R. § 211.18 (1983) ........ 10

36 C.F.R. § 218 (2018) ........ 6, 9, 10

36 C.F.R. § 218.1 (2018) ........ 11

36 C.F.R. § 218.14(a) (2018) ........ 5, 6, 7

36 C.F.R. § 218.2 (2018) ........ 10

36 C.F.R. § 218.22 (2018) .......... 17

36 C.F.R. § 218.22(d) (2018) .......... 16

36 C.F.R. § 218.8(d)(5) (2018) .......... 10

40 C.F.R. § 1502.9(c)(1) (2018) .......... 23

40 C.F.R. § 1502.9(c)(1)(ii) (2018) .......... 20

40 C.F.R. § 1508.8 (2018) .......... 23

## INTRODUCTION

Both the Appellant, Earth Island, and the Appellee, the Forest Service, share one primary concern about the Inyo National Forest: Today there are not nearly as many old or large trees as there once were.[1] Despite this general agreement, the Forest Service has authorized the logging of large trees on up to 9,031 acres of the Inyo National Forest as part of Three Creeks Project. Bringing this case, Earth Island seeks to compel the Service to both consider methods for achieving the Project's goals without logging additional old and large trees as well as thoroughly analyze how any planned removal of large trees will affect the environment.

Though the Service purports that the Three Creeks Project will eventually increase the number of large trees and thereby reduce the risk of wildfire and increase the resiliency of the Inyo National Forest, many of the Forest's current issues exist in large part due to decades of the Service carrying out policies of fire suppression and "fuel reduction" logging with a poor understanding of the resulting environmental consequences. Despite acknowledging these past missteps and their effects on the number of large trees in the region, the Service has failed to consider any alternative in its environmental review of the Project that does not

---

[1] Designing the Three Creeks Project, the Service described the "Desired Conditions" for the Project area as "a forest dominated by older, larger trees." 2-ER-196.

involve logging additional large trees, instead considering only one action alternative. Additionally, after rejecting Earth Island's proposed alternatives that were offered in response to the 2017 environmental assessment ("2017 EA"), the Service made other changes to the Project before publishing the 2018 environmental assessment ("2018 EA") but did not offer this updated document for public comment. Finally, the Service has failed to contemporaneously analyze the impacts of the Three Creeks Project after initiating a second project addressing a bark beetle outbreak that will remove additional large, dead or dying trees—which serve as crucial wildlife habitat—from the original Project area.

Therefore, each of the three issues on appeal in this case present the Court with the opportunity to compile its existing NEPA caselaw into plain statements aligning with the statute's underlying principles. While the Service's brief attempts to downplay the importance of NEPA's procedures by relating each issue to the 2018 EA's ultimate finding of no significant impacts, the analytical journey that an agency goes through when complying with these procedures can be just as important as the destination, as evidenced by the unintended consequences of previous generations' forest policy.

## ARGUMENT

Earth Island's claims are focused on the Service's perplexing decision to log old or large trees in the Project area without adequately exploring the

environmental consequences of this decision, yet the Service responds to these claims while donning procedural blinders. *E.g.*, Dkt. 22 at 67 ("Plaintiffs' argument that the Forest Service was required to prepare another SIR after proposing the Inyo Craters Project elevates NEPA's form over the statute's substance."). While it is true that "NEPA is a procedural statute" and this Court has held that "agency action taken without observance of the procedure required by law will be set aside," *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000), courts require such strict adherence to NEPA's procedures because only through these "action-forcing" procedures are the statute's "sweeping policy goals" realized. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1180 (9th Cir. 2011) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). By attempting to dismiss each of Earth Island's substantive claims with alleged procedural defects or by highlighting the agency's alleged bare procedural compliance with NEPA, it is the Service that ultimately elevates NEPA's form over the statute's substance.

## I. The Service failed to consider a reasonable range of alternatives and explain why it excluded viable alternatives from consideration.

The Service incorrectly argues that its regulations mandate issue exhaustion solely during the comment period and not the objection period, Dkt. 22 at 30, and makes the unsupported assertion that referencing a procedural defect satisfies this Circuit's requirement that an agency must offer an adequate explanation before

excluding a viable alternative from consideration, *id.* at 36; *see W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1053 (9th Cir. 2013). While advancing these procedural arguments, the Service conspicuously never cites evidence in the administrative record explaining why it designed and analyzed a project seeking to increase the number of old and large trees in the Inyo National Forest without even considering the possibility of preserving every large tree already present. This failure to consider a viable alternative was arbitrary, capricious, and not in accordance with NEPA's implementing regulations, in violation of 5 U.S.C. § 706(2)(A).

**A. Earth Island exhausted this issue before the Service, given that the Service's administrative proceedings include the objection process.**

The Service misunderstands the significance of *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), in this case and the structure of its own administrative review regulations, thus attempting to improperly narrow the scope of the Court's issue exhaustion analysis. Whereas the Supreme Court's single paragraph discussing issue exhaustion in *Public Citizen* is helpful for understanding the role that public participation plays in an agency's environmental review process, the case is not on point for limiting the scope of the issue exhaustion doctrine within the Service's predecisional administrative review process ("objection process") to solely comments put before the agency. Rather, the Service's own administrative review regulations speak to the contrary and

preclude the broad principles announced in *Public Citizen* from imposing the strict constraints that the Service describes. *See* 36 C.F.R. § 218.14(a) (2018); *see also Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("[R]equirements of administrative issue exhaustion are largely creatures of statute.").

**1. The Service's objection process regulations and their statutory authority preclude the Court from applying any prudential issue exhaustion requirements.**

Generally, when an agency's regulations provide for an administrative review process that is mandatory and renders the underlying action operative during review, the Administrative Procedure Act ("APA") requires the exhaustion of those administrative remedies as a prerequisite to judicial review of final agency action. 5 U.S.C. § 704.[2] While the APA requires exhaustion of administrative remedies, issue exhaustion is a related, but distinct doctrine that may be required either by statute, regulation, or as a judicially-imposed prudential requirement. 33 Charles Alan Wright et al., *Federal Practice and Procedure: Judicial Review of Administrative Action* § 8364 (2018). "[M]andatory exhaustion statutes…establish mandatory exhaustion regimes, foreclosing judicial discretion." *Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 895 (9th Cir. 2021) (quoting *Ross v. Blake*, 578

---

[2] The Service does not contest that Earth Island exhausted its administrative remedies.

U.S. 632, 639 (2016)). *Cf. Sierra Club v. Tahoe Reg'l Plan. Agency*, 916 F. Supp. 2d 1098, 1110 (E.D. Cal. 2013) (only applying *Public Citizen* in the absence of a statutorily imposed issue exhaustion requirement).

With regard to issue exhaustion, 36 C.F.R. § 218.14(a) states that "[t]he objection process set forth in this subpart fully implements Congress' design for a predecisional administrative review process" and that "[i]ndividuals and groups must structure their participation so as to alert the local agency officials making particular land management decisions of their positions and contentions." These regulations are promulgated in accordance with 16 U.S.C. § 6515(c)(2), which specifies that "[a]n issue may be considered in the judicial review of an action…only if the issue was raised in an administrative review process described in paragraph (1)," where paragraph (1) refers to the predecisional administrative review process implemented by 36 C.F.R. § 218. *See* Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, § 428, 125 Stat. 1046 (2011) (codified at 16 U.S.C. § 6515 note). Therefore, it is through Congress's design that parties challenging a Service project may exhaust an issue at any point during the predecisional administrative review process. This statutory scheme forecloses judicial discretion. *See Vasquez-Rodriguez*, 7 F.4th at 895.

2. ***Public Citizen* does not apply strict limitations on the scope of the Court's issue exhaustion analysis because the Service's regulations do not impose any such limitations and the facts of that case are distinguishable.**

Although the Service repeatedly cites *Public Citizen* for the assertion that issue exhaustion is limited to the comment period, 36 C.F.R. § 218.14 describes the objection process with almost the exact same language requiring issue exhaustion as the Supreme Court used in *Public Citizen* to describe the circumstances in which a party must exhaust an issue before the agency. *Compare* 36 C.F.R. § 218.14(a) (2018) (explaining that during the objection process "[i]ndividuals and groups must structure their participation so as to alert the local agency officials making particular land management decisions of their positions and contentions"), *with Pub. Citizen*, 541 U.S. at 764 ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it...alerts the agency to the [parties'] position and contentions[.]'") (internal quotations omitted). Therefore, 36 C.F.R. § 218.14(a) applies the principles of *Public Citizen* to the broader set of opportunities for public participation mandated by the Service's regulations.

In contrast, *Public Citizen* referred specifically to the environmental plaintiffs' failure to "identif[y] in their *comments* any rulemaking alternatives beyond those evaluated in the EA," 541 U.S. at 764 (emphasis added), because the agency action at issue was a final rule promulgated through informal rulemaking

and the comment period was the only relevant opportunity for public participation in the Federal Motor Carrier Safety Administration's administrative proceedings, *see* Brief for Petitioners at 10–14, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) (No. 03-358).

The two other cases the Service cited for the proposition that issue exhaustion must occur during a comment period are distinguishable on similar grounds as *Public Citizen* because they each involved administrative proceedings that consisted solely of comment periods before the challenging party sought judicial review of the administrative action. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 592–93 (9th Cir. 2018) (no administrative proceedings between comment period on EIS and publication of record of decision); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, ("*NICAN*"), 545 F.3d 1147, 1152, 1156 n.2 (9th Cir. 2008) (alternative not exhausted during "comment periods" was not raised until after litigation commenced). In contrast, when an agency's regulations provide for public participation opportunities beyond a comment period, *Public Citizen*'s principles merely dictate that "a party forfeits arguments that are not raised during the *administrative process*." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) (emphasis added) (citing *Pub. Citizen*, 541 U.S. at 763–65) (party exhausted issue by raising it in its administrative challenge).

Twisting the language of 36 C.F.R. § 218, the Service laments that "[t]he objection process is the Forest Service's administrative review process *after* the agency has already completed the EA, not an opportunity for parties to raise previously undeclared project alternatives." Dkt. 22 at 32. However, the Service cannot support this assertion. When promulgating its objection process regulations, the Service explained "that considering public concerns early on, *before a decision is made* aligns with the Service's collaborative approach to forest management and increases the likelihood of resolving those concerns resulting in better, more informed decisions." Project-Level Predecisional Administrative Review Process, 78 Fed. Reg. 18481, 18483 (Mar. 27, 2013) (codified at 36 C.F.R. pt. 218) (emphasis added). This reading of 36 C.F.R. § 218 aligns with how the objection process functioned here: The Service solicited objections on the Revised 2017 EA before publishing the Final 2018 EA, which incorporated changes suggested in objections from members of the public. *See* discussion *infra* Section II.

Furthermore, unlike these *predecisional* administrative review regulations, the Service previously employed a *postdecisional* administrative review process, which this Court interpreted to require issue exhaustion during the comment period. *See Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) (declining to hear "belatedly raised issues"), *aff'g Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1501 (D. Ariz. 1990) (explaining that issues were not

raised until *postdecisional* administrative appeal under 36 C.F.R. § 211.18 (1983)). However, Congress has since required the Service to employ a predecisional administrative review process. *See* Consolidated Appropriations Act, 2012 § 428. The Service cites *Havasupai Tribe*, but misses this key distinction in the regulations at issue. Dkt. 22 at 34.

Therefore, the Service is incorrect in arguing that its regulations require issue exhaustion solely during the comment period. Such a reading of 36 C.F.R. § 218 would require parties seeking to challenge a Forest Service action to make the same exact predecisional comment twice—once during the comment period and once during the objection period. Rather, Earth Island acted in accordance with the regulatory scheme by offering substantive comments on the Draft 2016 EA and then, after that input was not adequately incorporated into the Revised 2017 EA, filing a predecisional objection explaining how that EA "violate[d] law, regulation, or policy" by failing to consider viable alternatives. *See* Dkt. 13 at 30 (citing 36 C.F.R. § 218.2, 218.8(d)(5)). Through these comments and objections, Earth Island structured its participation so that it alerted the Service to its position and contentions and allowed the Service to give the issues meaningful consideration. *See Pub. Citizen*, 541 U.S. at 764.

### B. Earth Island complied with the Service's objection process regulations when it filed its objections.

The Service faults Earth Island's objection to the 2017 EA's consideration of alternatives because the objection is allegedly not "based on previously submitted specific written comments regarding the proposed project." Dkt. 22 at 32 (citing 36 C.F.R. § 218.1 (2018)). The Service itself designated Earth Island's comment on the 2016 EA highlighting the ineffectiveness of thinning—and thus highlighting the need to consider an action alternative not logging any large trees—as specific. *See* 2-ER-280 (marking the response to Earth Island's comment with "(S)"); 2-ER-266 ("Specific (S) comments"). The Service also argues that Earth Island did not comply with regulations requiring objections to include "[a] statement that demonstrates the connection between prior specific written comments on the particular proposed project or activity and the content of the objection." Dkt. 22 at 32 (citing 36 C.F.R. § 218.8(d)(6) (2018)). Earth Island concluded its objection by writing:

> In short, because the proposed project seeks to log native Jeffrey pine and mixed-pine stands, and justifies that logging based on…flawed policies as described above *and in our comments*, and because no EIS was prepared and the EA is inadequate, such logging should not go forward….At a minimum, the Project's logging units should be converted into prescribed burning units (with no pre-fire thinning/logging)[.]

2-ER-304 (emphasis added). This statement connects Earth Island's comment highlighting thinning as an ineffective policy to reduce fire intensity, 3-ER-430–32, to its present objection that the EA did not consider an action alternative that did not include logging large trees.

While the Service is currently attempting to leverage these procedural requirements to avoid addressing the substantive issues raised by Earth Island's comments and objections, the Service plainly stated when it promulgated its current objection regulations that "[b]oth the objection eligibility requirement and the constraint on issues raised in objection are included…to encourage early and active involvement by the public in project planning and analysis. *Neither is intended to be used primarily as a mechanism to exclude public involvement or the consideration of important issues*." Project-Level Predecisional Administrative Review Process, 78 Fed. Reg. at 18487 (emphasis added).

**C. The Service's consideration of alternatives in the 2018 EA was arbitrary and capricious because it did not analyze an adequate range of alternatives and failed to explain why it did not consider viable alternatives offered by Earth Island.**

The Service offers additional explanations as to why it was not required to give Earth Island's alternatives meaningful consideration; however, the agency did not offer these post hoc explanations at the time of the decision and therefore the Court cannot consider them now. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878 (9th Cir. 2022) (explaining the "the well-established

principle that an agency's action must be upheld, if at all, on the basis articulated by the agency itself" (internal quotation marks omitted)). Nonetheless, Earth Island has shown that its proposed alternatives would meet the Project's purpose and need and are significantly distinguishable from the alternatives that the Service considered. *See* Dkt. 13 at 33–38.

The Service argues that "Plaintiffs have not shown that their alternatives would have substantially different environmental consequences than the proposed action." Dkt. 22 at 41. Earth Island's objection states that its proposed alternatives would "mitigat[e] impacts to sensitive species," which is further supported by the assertions earlier in the objection that "black-backed woodpeckers need high snag densities in severely burned forest; the only way to create such high snag densities post-fire is for there to exist high tree density pre-fire" and that "new research from the Sierra Nevada concludes that this very sort of project, which reduces canopy cover down to about 40%, adversely affects martens significantly, and they tend to avoid such logged areas." 2-ER-301–303. Although the Service claims that logging an unknown number of trees larger than 10, and even 24, inches in diameter is not significantly distinguishable from only removing only trees under 8 inches in diameter or logging no trees at all, Dkt. 22 at 38–39 (citing 2-ER-202), this assertion disregards any impacts to the fauna that rely on these medium and large trees.

Continuing to offer post hoc rationalizations as to why it was not required to the consider Earth Island's proposed alternatives, the Service relies on language in *Earth Island Institute v. U.S. Forest Service* ("*Earth Island*") suggesting that agencies do not need to consider "more environmentally sound alternatives" when its preferred alternative will result in a FONSI. Dkt. 22 at 39–40 (quoting *Earth Island*, 697 F.3d 1010, 1023 (9th Cir. 2012)). While Earth Island appreciates the Service's implicit acknowledgment that Earth Island's proposed alternatives are "more environmentally sound" than the preferred action alternative,[3] this dicta in *Earth Island* does not control here for two reasons.

First, this Court's process for evaluating an agency's alternatives analysis has evolved since *Earth Island* was decided in 2012 and an unsupported rejection of a viable alternative is no longer sufficient. *See Env't Def. Ctr.*, 36 F.4th at 877 (finding consideration of alternatives arbitrary and capricious where "[t]he agencies gave no explanation for why the alternatives proposed did not lend themselves to meaningful analysis.") Second, this language in *Earth Island* is dicta, not the holding, because the Service in that case gave a reasoned explanation for declining to give the plaintiffs' proposed alternatives additional consideration

---

[3] It is unclear how Earth Island's proposed alternatives can be simultaneously not significantly distinguishable from the Service's preferred alternative, but also more environmentally sound than that alternative.

by explaining how the plaintiffs' proposed alternative would not meet the project's purpose. *Earth Island*, 697 F.3d at 1022–23.[4]

The Service also cites *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233 (9th Cir. 2005), for the proposition that the Service does not need to analyze an alternative specifically excluding commercial thinning, Dkt. 22 at 40; however, Earth Island's proposed alternatives do not focus on the commercial element of the Project, but rather seek to avoid logging any of the remaining large trees or avoid general thinning that could unnecessarily harm the Project area's biota. 2-ER-301–04.

In conclusion, Earth Island presented the Service with both viable alternatives and supporting scientific studies during the Project's administrative proceedings and the Service was thus required to, but did not, give those alternatives meaningful consideration or offer an adequate explanation—at the time of the decision—as to why it did not consider an action alternative that did not include logging large trees. *See W. Watersheds Project*, 719 F.3d at 1050, 1053.

[4] Another case the Service relies on, *North Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006), is also distinguishable because there the BLM actually explained that it excluded the plaintiffs' proposed alternative from meaningful consideration because it was inconsistent with the project and its statutory mandates. *Id.* at 978.

## II. The Service's failure to offer an opportunity to comment on the 2018 EA violated both the CEQ's NEPA implementing regulations and the Service's objection process regulations.

The Service misstates the standard contained in its own regulations and then incorrectly applies this standard in a manner that overlooks major changes between the 2017 and 2018 EAs that affected how the public could understand the Project's impacts on old and large trees in the region. First, the Service's objection process regulations require it to offer an opportunity for public comment when it prepares a "a supplemental or revised EA or EIS…based on consideration of new information or changed circumstances." 36 C.F.R. § 218.22(d) (2018). Attempting to raise the threshold for this requirement, the Service argues that this regulation refers to "new information or changed circumstances," *id.*, that "[are] sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered," *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557–58 (9th Cir. 2000). Dkt. 22 at 44.[5] However, this Court in *Friends of the Clearwater* addressed the standard for when an agency must *publish* a supplemental EIS, not when it must circulate a revised or

[5] The Service's use of quotations and citations here is misleading, as it provides quotations from two separate and unrelated sources within the same sentence, yet uses a citation sentence that does not clarify which source provides each quotation. *See* The Bluebook: A Uniform System of Citation B1.1, at 4 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) ("Use citation sentences to cite sources and authorities that relate to the <u>entire</u> preceding sentence.").

supplemental document for public comment. 222 F.3d at 557–58. Here, the Service had already published a revised EA when Earth Island requested the opportunity to comment on the document pursuant to 36 C.F.R. § 218.22. 2-ER-292–93. The Service's regulations mandate that it offers the public such an opportunity when a revised EA is published based on "new information or changed circumstances," regardless of how those revisions may affect the environment. 36 C.F.R. § 218.22.

Second, the Service improperly dismisses the "new information or changed circumstances" raised by Earth Island as not warranting additional public comment because those changes did not meet its artificially elevated threshold based on inapposite caselaw. Although the Service relies on its own characterization of the changes made between the 2017 and 2018 EAs as merely "clarifications," Dkt. 22 at 45 (quoting 2-ER-292), such a characterization of these revisions is irrelevant to how they influenced the public's ability to comment. For instance, the 2018 EA changed the descriptions of the Project area's desired conditions and the methods the Service would use to achieve those desired conditions—most notably reducing the desired number of large trees per acre from 22 to 14. Dkt. 13 at 45–46. While the Service argues that these changes did not affect its own analysis of the Project's environmental impacts, Dkt. 22 at 37, the Service's regulations do not require such a effect before triggering the need for additional public comment. Even if these "clarifications" did not change the underlying stand density metrics

driving the *Service's* analysis, the purpose of public comment is to allow the *public* to weigh in on a project's potential impacts with its own analysis. *See California v. Block,* 690 F.2d 753, 771 (9th Cir. 1982) ("The main policy reason for soliciting public comment is to use public input in assessing a decision's environmental impact."). Although Service experts may not focus on a Project's desired conditions when evaluating environmental impacts based on an EA, the conditions are listed early on in the "Purpose and Need for Action" section of both the 2017 and 2018 EAs and inform how a member of the public will interpret the document. 3-ER-314–16; 2-ER-194–96. In the context of an EIS, this Court has stated that when determining whether the document "fosters informed decision-making and public participation, we consider not only its content, but also its form." *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1073 (9th Cir. 2010).

Therefore, the Court should consider how the changes the Service made between the 2017 and 2018 EAs affected how the public could weigh in on the proposed action. The Service changed its proposed action to state that the vast majority of trees being cut are below 10 inches in diameter, 2-ER-202, instead of between 10 and 20 inches in diameter, 3-ER-322. This change directly affected how the commenting public could propose alternatives that would meet the Project's purpose and need by making an alternative that does not involve logging large trees even more viable. *See* Dkt. 13 at 45–46. Similarly, when the Service

changed its desired conditions to maintain only 14 larges trees per acre, 2-ER-196, instead of 22 large trees per acre, 3-ER-316, this changed the protections that the commenting public could propose for large trees and the environmental impacts to consider. Not only are these revisions major changes, they also contradict one another with respect to the size of trees that will be logged and raise serious questions as to the Service's internal understanding of the Project and its environmental impacts.

Finally, with regard to the new information added in the 2018 EA relevant to the black-backed woodpecker and the Pacific marten, the Service focuses only on how this information did not change the *Service's* ultimate conclusions about impacts on those species, not how this information may have changed the *public's* interpretation of those impacts. Specifically regarding the Moriarty study, the Service fails to recognize that although Earth Island "had the opportunity to comment on it" when submitting its objection, Dkt. 22 at 51, Earth Island was unable to subsequently comment on the Service's interpretation of the study. Although it cited the Moriarty study in the 2018 EA, the Service did not acknowledge the study's overarching conclusion that "the most obvious recommendation to benefit martens is to plan fuels treatments outside of their habitat." 3-ER-543. Instead, the Service reasoned that logging and removing large trees in or near marten habitat was a foregone conclusion, so "maintaining or

increasing structural variation" to increase the use of these stands by martens would be sufficient, 2-ER-228. Additionally, other members of the commenting public were not afforded the opportunity to comment on the Moriarty study or the Service's application of it.

In light of these changes made between the 2017 and 2018 EAs, the Court should require the Service to solicit additional public comments because its failure to do so was arbitrary, capricious, and in violation of NEPA. *See* 5 U.S.C. § 706(2)(A).

## III. The Service violated its continuing NEPA obligations by failing to supplement its NEPA analysis for the Three Creeks Project in response to the bark beetle outbreak and its subsequent announcement of the Inyo Craters Project.

An agency is required to supplement its NEPA analysis when "there are significant new circumstances or information relevant to environmental concerns bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (2018). However, the Service's assertion that a supplemental EA is only required when new information "result[s] in significant, unevaluated impacts," Dkt. 22 at 53, is incorrect and misreads the case cited, *Price Road Neighborhood Association v. U.S. Department of Transportation*, ("*Price Road*"), 113 F.3d 1505, 1510 (9th Cir. 1997). Rather, "[i]n *Price Road*…[this Court] explained that 'if the environmental impacts resulting from the design change are *significant or uncertain*, as compared

with the original design's impacts, a supplemental EA is required.'"[6] *Alexander*, 222 F.3d at 566 (quoting *Price Rd.*, 113 F.3d at 1508–09) (emphasis added). This distinction is important because it highlights that environmental plaintiffs seeking to compel an agency to supplement an EA are not burdened with showing that new information will have a significant impact, but only must show that the information itself is significant and its potential impacts are uncertain and warrant additional consideration by the agency. *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) (describing this burden as a "low standard").

### A. The Service failed to supplement its NEPA analysis to address significant new circumstances and information resulting from the bark beetle outbreak.

Overall, the Service's arguments miss two main points: (1) The impacts resulting from the bark beetle outbreak are uncertain, even if not clearly significant, and (2) the marten units included in each of the three EAs did not "mitigate" the Project's adverse impacts, but they did represent the Service's assumption that marten were not present in much of the Project area and thus would not be impacted by the Project's logging and other treatments.

---

[6] The Service's reliance on *Marsh v. Oregon Natural Resource Council*, 490 U.S. 360 (1989), is similarly misplaced. Dkt. 22 at 14. *Marsh* articulated the standard for supplementing an EIS, which is used to analyze significant impacts on the environment, *id.* at 372–73, whereas an EA is used to determine whether uncertain impacts are significant and thus must be supplemented more frequently to address impacts not thoroughly analyzed in the original document. *See Price Rd.*, 113 F.3d at 1509–10.

Regarding uncertainty, the Service characterizes the possibility that "martens would move into the currently unsuitable habitat in the project area instead of into more suitable habitat outside the project area" as "speculation with no supporting evidence." Dkt. 22 at 57. In the absence of supplemental NEPA analysis, the extent of the Service's documented knowledge is that 1.8 percent of previously designated high quality marten habitat in the cumulative effects analysis area was lost, 2-ER-99, and an additional 5 percent of marten habitat will be negatively impacted by thinning, 2-ER-227.[7] However, any potential impacts of thinning in this 5 percent that were once understood as insignificant are now uncertain because the Service's initial conclusion that "[a] reduction in habitat quality as a result of project implementation is expected to have little direct or indirect impact on martens" was predicated on the knowledge that "they generally do not use much of the area within proposed treatment units." *Id.* Therefore, Earth Island's argument is not just "speculation with no supporting evidence," but rather an identification of uncertain impacts. The Service's assumptions in the 2018 EA about marten use in

[7] The Service acknowledged in the 2018 EA that "subsequent fuels treatment…would likely remove…important features for martens. Martens may avoid the treated stands for some period…." 2-ER-227. Although the Service quotes language from the 2020 SIR stating that the remaining "[p]roject treatments will not further reduce [marten] overall habitat availability," Dkt. 22 at 55, "available" habitat that lacks important features to the extent that it is actively avoided does little to benefit martens, which "rarely enter openings likely because of increased risk of predation" and whose "populations may decline sharply with relatively modest amounts (<35%) of forest loss." 3-ER-535 (citations omitted).

the Project area are now untenable because without supplemental analysis, it is unknown where the martens displaced by habitat degradation will go. *See LOWD/BMBP v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014) (requiring a supplemental EIS because the original EIS's analysis was "interwoven" with statements relying on a since-removed wildlife habitat design feature).

The Service also argues that the Project was designed to "promote forest health[], which benefits marten overall," and thus dropping the marten units "does not significantly change the project's effect on the marten," Dkt. 22 at 56–57. However, potential positive impacts do not necessarily negate the need to analyze any potential negative impacts. *See* 40 C.F.R. § 1508.8 (2018). Therefore, the uncertain nature of the Project's impacts on marten require as a result of the bark beetle outbreak require supplemental NEPA analysis and the 2020 SIR does not meet this need.

**B. Beyond failing to supplement its NEPA analysis after the bark beetle outbreak, the Service has failed to even consider whether the Inyo Craters Project—including its cumulative impacts—warranted supplemental analysis.**

Despite publishing an SIR in response to the bark beetle mortality in the original Project area and announcing the Inyo Craters Project itself, the Service implies that it did not have notice of its duty to supplement its environmental analysis in response to the Inyo Craters Project. *See* 40 C.F.R. § 1502.9(c)(1) (2018); *Friends of the Clearwater*, 222 F.3d at 559. The cumulative impacts of the

Three Creeks and Inyo Craters Projects warrant at minimum an SIR, and potentially a supplemental EA, neither of which can be replaced by post hoc explanations as to why the new information was not significant. *See Friends of the Clearwater*, 222 F.3d at 558.

**1. Earth Island's amended complaint filed with the district court was pleaded sufficiently broadly to encompass the Service's failure to consider the Inyo Craters Project primarily because the Service generated the claim's underlying facts.**

The primary principle underlying Rule 8's "notice" pleading requirement is "to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1213, 1216 (9th Cir. 2011). The Service offers no explanation in its briefing as to why Earth Island's statement of its claim in its First Amended Complaint (FAC) and its subsequent, more specific, reference to the Inyo Craters Project in its summary judgment briefing, hindered the Service's ability to defend itself effectively. *See* Dkt. 22 at 60–63. Instead, the Service focuses entirely on the fact that the Inyo Craters Project was not announced at the time that Earth Island filed its FAC, a timing issue that this Court has held is inconsequential in a NEPA action alleging a failure to supplement. *See Friends of the Clearwater*, 222 F.3d at 558–58.

The Service misunderstands the significance of *Friends of the Clearwater* in addressing this issue, arguing that it is not on point because it does not address pleading standards in the complaint. Dkt. 22 at 63. In that case, the plaintiffs first

articulated in their summary judgment briefs the facts underpinning their failure to supplement claim, including the designation of the Northern Goshawk as a sensitive species, which occurred during summary judgment briefing. Appellee Forest Service's Opening Brief at 2–3, 56; Plaintiffs-Appellants' Opening Brief at 8 n.7, *Friends of the Clearwater*, 222 F.3d 552 (9th Cir. 2000) (No. 99–35642). Nonetheless, this Court held that the plaintiffs' failure to "specifically identify this new information as the basis for their demands until after they sued the Forest Service did not excuse the Forest Service from earlier assessing the need for an SEIS." *Friends of the Clearwater*, 222 F.3d at 558–59. Thus, this Court did not address pleading standards in that case because "[i]t is the agency, not an environmental plaintiff, that has a 'continuing duty to gather and evaluate new information relevant to the environmental impact of its actions.'" *Id.* at 559 (quoting *Warm Springs Task Force v. Gribble*, 621 F.2d 1017, 1023 (9th Cir. 1980)). This Court in *Klamath-Siskiyou Wildlands Center v. MacWhorter*, 797 F.3d 645 (9th Cir. 2015), further emphasized that the agency does not need to be given detailed notice of factual allegations underpinning the agency's continuing legal obligations if the relevant information "is available to the [agency] directly, without first having to provide it to [the plaintiff] which would, in turn, then provide it back to the [agency], the original source of the information." *Id.* at 653–

54. Therefore, Earth Island is not barred from including the Inyo Craters Project in its failure to supplement claim.[8]

The Service relies heavily on *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008), however, in that case the plaintiffs' complaint did not include their claim that the Service's FEIS failed to consider the potential impacts of human ingestion of artificial snow or the factual allegations underpinning the claim. *Id.* at 1079. Here, Earth Island pleaded its failure to supplement claim in its FAC, failing only to specifically include the forthcoming Inyo Craters Project. 2-ER-133–35. Also unlike *Navajo Nation*, the Inyo Craters Project was proposed by the Forest Service, 2-ER-84, 174, and thus the new factual basis for Earth Island's claim should have been immediately apparent to the Service as part of its continuing obligation to supplement is EA for the Three Creeks Project. *See NICAN*, 545 F.3d at 1155 ("Agencies have a continuing obligation to consider new information that comes to light[.]").

---

[8] For additional context, the Service published the Inyo Craters Project scoping notice on June 14, 2021, 2-ER-84, three days after Earth Island filed its FAC adding a failure to supplement claim, 2-ER-107–37. Requiring plaintiffs to amend their complaint every time an agency generates new information underpinning an existing claim related to a continuing obligation would be nothing more than an exercise in motions practice that would needlessly prolong litigation. Recognizing the difficulty inherent in policing an agency's compliance with continuing NEPA obligations, this Court in *Friends of the Clearwater* reminded the Service that "[c]ompliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." 222 F.3d at 559.

### 2. The Service violated its NEPA obligations by failing to consider whether the Inyo Craters Project warranted supplemental NEPA analysis addressing the two projects' cumulative impacts.

The Service argues that it that was not required to publish an SIR for the Three Creeks Project addressing the potential impacts of the Inyo Craters Project because any such impacts were addressed by the latter's scoping document notice as well as the 2020 SIR. Dkt. 22 at 64–68. However, neither of these documents explicitly analyze the effects of removing additional large dead and dying trees from the area surrounding the Three Creeks Project. Instead, the 2020 SIR notes that "[a]ny future proposals or projects…will be analyzed as required under NEPA," 2-ER-101, and the Inyo Craters Project scoping notice dodges any analysis of cumulative impacts by stating that the project is anticipated to be completed subject to a categorical exclusion, 2-ER-85.

Focusing solely on these documents, the Service overlooks the common sense conclusion that when the 2018 EA was published habitat in the marten units was going to be "enhance[d]," 2-ER-228, but now the Service intends to remove large trees from both those units and a broader area, compromising habitat important to the marten and other species, 2-ER-84–85. *See also* 2-ER-231 (martens require habitat with "large diameter trees and snags, large down logs").

Additionally, the Service misunderstands Earth Island's reference to the Three Creeks Project's description of the desired "pre-settlement conditions" as

dominated by large trees. Dkt. 22 at 65. By removing additional dead and dying trees directly adjacent to the Project area, the Inyo Craters Project changes the context of the Service's desired conditions leaving an average of 14 large trees per acre, 2-ER-196, and retaining or creating three snags per acre, 2-ER-207, within the Three Creeks Project area. While the Service's brief sanitizes the effects of the Inyo Craters Project by suggesting that it "would not affect living, healthy large trees, only dead or dying ones that pose an imminent safety hazard," Dkt. 22 at 65, this artificial distinction misses the important role that dead and dying trees, or "snags," can play in a functioning ecosystem, particularly as habitat for important fauna in the region. *See, e.g.*, 2-ER-231 ("Martens prefer coniferous forest habitat with large diameter trees and snags, large down logs, moderate-to-high canopy closure, and an interspersion of riparian areas and meadows."); 3-ER-426 ("[V]ery high snag-density beetle-kill areas tend to slow the population decline of Black-backed Woodpeckers in between occurrences of wildland fire.").

Furthermore, by attempting to analogize to *Habitat Education Center v. U.S. Forest Service*, 673 F.3d 518 (7th Cir. 2012), the Service implies the Inyo Craters Project will analyze the cumulative impacts of the two projects. Dkt. 22 at 67. However, in that case, the Seventh Circuit determined that the Service reasonably did not include a future project in its cumulative impacts analysis of a present project because the future project was inchoate at the time of the present project's

environmental analysis and because the future project actually included the earlier project in a cumulative impacts analysis. *Habitat Educ. Ctr.*, 673 F.3d at 529–30. Thus, *Habitat Education Center* would only be analogous if the Inyo Craters Project were to consider the cumulative impacts of the Three Creeks Project and the Service does not point to any evidence in the record indicating that this is the case.[9] In fact, the Service's intent to use a categorical exclusion for the Inyo Craters Project indicates that no such analysis will occur. *See* 2-ER-85.

In conclusion, the Service has not analyzed the uncertain impacts on the environment that will result from the combination of the Three Creeks and Inyo Craters Projects nor explained how its environmental review of the Inyo Craters Project will analyze these impacts. Supplemental NEPA analysis, or at least an SIR, is required in order to address these impacts.

## CONCLUSION

For the above reasons and those set forth in Earth Island's opening brief, Dkt. 13, the Court should reverse the district court's decision to grant the Service's motion for summary judgment on the three aforementioned issues and order the

---

[9] Earth Island raised *Habitat Education Center* in its opening brief merely to highlight the court's articulation of the applicable standard. Dkt. 13 at 65; *see Habitat Educ. Ctr.*, 673 F.3d at 529 ("[I]f new information about a future project becomes clear while the current projects are pending, and that information significantly alters the previously presented environmental landscape, the agency would be required to issue a supplement to its…final EIS.").

district court to enter judgment in favor of Earth Island and to vacate the Service's 2018 Decision Notice approving the Three Creeks Project. 2-ER-17–87.

Respectfully submitted this 30th day of June, 2023.


/s/ Thomas Buchele
Thomas Buchele
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
(503) 768-6736
tbuchele@lclark.edu

Andrew B. Baloga
Certified Law Student

**CERTIFICATE OF COMPLIANCE**
**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** No. 22-16751

I am the attorney or self-represented party.

**This brief contains __6,997__ words,** including __0___ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Thomas Buchele__________ **Date** 06/30/2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*